250 N.J. Super. 189 (1991)
593 A.2d 1193
IN RE ADOPTION OF N.J.A.C. 7:26B.
PUBLIC INTEREST RESEARCH GROUP OF NEW JERSEY, NEW JERSEY ENVIRONMENTAL LOBBY, KEITH ONSDORFF, SOCIETY FOR ENVIRONMENTAL ECONOMIC DEVELOPMENT, CHEMICAL INDUSTRY COUNCIL OF NEW JERSEY, ASHLAND CHEMICAL COMPANY AND COOPER INDUSTRIES, INC., APPELLANTS,
v.
NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued November 15, 1990.
Decided May 6, 1991.
*197 Before Judges KING, R.S. COHEN and STERN.
Edward Lloyd argued the cause for appellant Public Interest Research Group of New Jersey, New Jersey Environmental Lobby and Keith Onsdorf (Deborah Schwenk, on the brief).
Kenneth H. Mack argued the cause for appellants Society for Environmental, Economic Development and Chemical Industry Council of New Jersey (Picco Mack Kennedy Jaffe Perrella & Yoskin, attorneys; Steven J. Picco and Kenneth H. Mack, of counsel; Kenneth H. Mack and Linda Mack, on the brief).
Anthony King, admitted pro hac vice, argued the cause for Ashland Chemical Company and Cooper Industries, Inc. (Kaye, Scholer, Fierman, Hays & Handler, attorneys; Christopher H. Marraro, of counsel and on the brief).
Gerard D. Burke, Deputy Attorney General, argued the cause for respondent, Department of Environmental Protection (Robert J. Del Tufo, Attorney General, attorney; Mary C. Jacobson, Deputy Attorney General, of counsel; Paul H. Schneider, Deputy Attorney General, on the brief).
The opinion of the court was delivered by KING, P.J.A.D.
This is a challenge by industry and environmental appellants to regulations promulgated by the Department of Environmental *198 Protection (DEP) to implement the Environmental Cleanup Responsibility Act (ECRA or the Act), N.J.S.A. 13:1K-6 to -14, L. 1983, c. 330. ECRA imposes responsibilities on owners and operators of industrial establishments as a precondition for the sale, transfer, or termination of operations at these facilities.
In this matter the Society for Environmental Economic Development, Chemical Industry Council of New Jersey, Ashland Chemical Company and Cooper Industries, Inc. (industry appellants) have lodged broad-based attacks on several sections of the regulations, particularly those sections which "trigger" operation of the Act. The Public Interest Research Group of New Jersey, the New Jersey Environmental Lobby, and Keith Onsdorff (environmental appellants), present a more limited challenge to the regulations which exempt from ECRA certain intra-family transfers and partial conveyances.
Industry appellants contend that DEP is without statutory authority to issue these "business-oriented" regulations, that the regulations are not entitled to any presumption of validity because they are beyond the scope of DEP's special expertise, and that they violate the Commerce Clause as an impermissible burden on interstate commerce because they provide that transactions by an out-of-state parent corporation may impose ECRA obligations on an industrial establishment in New Jersey owned by that parent corporation. In addition, industrial appellants contend that several specific provisions of the regulations  primarily those regulations which define and elaborate on the transactions which trigger ECRA  impermissibly expand the scope of the statute and apply it to situations remote from the actual transfer or sale of an industrial establishment.
Specifically, industrial appellants attack regulations which: (1) provide that certain transactions involving a parent corporation trigger ECRA obligations with respect to an industrial establishment owned or operated by a subsidiary of the parent; (2) define the statutory trigger "proceeding through which an industrial establishment becomes nonoperational for health or *199 safety reasons" as including temporary closing for fires, explosions or other events; (3) apply ECRA to some situations where only a portion of the real property of the establishment is conveyed; and (4) define such terms as "sale of the controlling share of the assets" of a corporation, a statutory ECRA trigger. Appellants also attack regulations which hold that ECRA is applicable to any sale of a general partnership interest, as well as certain sales of limited partnership interests, in a partnership which operates an industrial establishment and regulations which require the "cleanup plan" required by ECRA to include measures for remedying contamination not actually on the site of the industrial establishment.
This is the procedural background of these challenged regulations. On May 4, 1987, DEP published proposed rules which were designed to implement ECRA, 19 N.J.R. 681(a). Public hearings on the proposed regulations were held in June, 1987; written comments were also accepted. On November 30, 1987 the Commissioner of DEP adopted these regulations and the notice of adoption was published on December 21, 1987, 19 N.J.R. 2435(a).
In January 1988, the industry appellants filed appeals challenging these regulations (hereafter "prior regulations"). The environmental appellants also filed a joint notice of appeal challenging the regulations on February 4, 1988. The appeals were consolidated by us on February 22, 1988.
DEP moved on September 21, 1988 to remand the matter to allow it to reconsider the prior regulations and develop revised regulations after consultation with appellants. We granted DEP's motion on October 20, 1988 and directed that the proceedings on remand be completed, as proposed by DEP, by March 1, 1989.
After consultation with appellant, DEP proposed amendments to the prior rules on February 21, 1989, 21 N.J.R. 596(a). On February 10, 1989, DEP requested an extension of time until June 30, 1989 to complete its rulemaking process. We *200 granted this request on April 10, 1989. Revised rules were adopted by DEP on June 30, 1989, and published in the New Jersey Register on August 7, 1989, 21 N.J.R. 2367(a). This appeal followed.

 Table of Contents
 Page
 I  Review of ECRA 200
 II  Standards of Review for ECRA "Trigger" 204
 Regulations
 III  Parent-Subsidiary Triggers 207
 IV  Regulation Defining "Corporate Reorganization" 216
 V  Regulation Defining "Controlling Interest" 218
 VI  Regulation Defining "Cessation of All Operations" 223
 VI(A)  Standards Needed for Nonapplicability Provision, 225
 N.J.A.C. 7:26B-1.9
 VII  Closures for Health or Safety Reasons under 230
 N.J.S.A. 13:1K-8b
 VIII  Sales of Partnerships Triggers 232
 IX  Changes in SIC Number Triggers 238
 X  Regulation Defining "Sale of Controlling 240
 Share of Assets"
 XI  ECRA as "Site Specific" 243
 XII  Regulations on Condemnations as "Triggers" 246
 XIII  Regulation Defining "Industrial Establishment" 249
 XIV  The Commerce Clause Challenge 252
 XV  Regulations Exempting Intrafamily Transfers 254
 Conclusion 255

I

A General Review of ECRA
A brief review of ECRA and its regulatory progeny is useful in understanding the Act. "A determination of responsibility for contamination plays no part in the ECRA process." Dixon Venture v. Joseph Dixon Crucible, Co., 235 N.J. Super. 105, 109, 561 A.2d 663 (App.Div. 1989), modified and aff'd, 122 N.J. *201 228, 584 A.2d 797 (1991). ECRA was designed to impose a "self-executing duty to remediate without the necessity and delay of a determination as to liability for the contamination" upon closure, sale or transfer of certain potentially polluted properties. Superior Air Prod. v. NL Indus., Inc., 216 N.J. Super. 46, 62-63, 522 A.2d 1025 (App.Div. 1987). Environmental cleanup, or firm arrangements for such remediation, was a precondition of the land transaction and was under the control of DEP.
Our Supreme Court recently stated as to ECRA:
ECRA is quite unlike other environmental regimes in that it uses market forces to bring about the reversal of environmental pollution. It recognizes that some environmental conditions not posing an imminent hazard to air or water resources of the state may safely attend economic activities. Thus, ECRA does not impose an independent duty to clean up the property during a period of operation, although the owner cannot walk away from the scene after deciding to cease operations. But, absent provisions in the contract, in the event of sale, under ECRA the seller assumes the risks of compliance. [Dixon Venture v. Joseph Dixon Crucible, Co., 122 N.J. at 231-232, 584 A.2d 797.]
N.J.S.A. 13:1K-7 sets forth the legislative findings which resulted in the enactment of ECRA: the legislation was prompted by a concern that the generation, handling, storage and disposal of hazardous wastes posed an inherent danger to the citizens, property and natural resources of the State. The Legislature determined that it was necessary to ensure that appropriate cleanup procedures be implemented as a precondition for the closure or transfer of facilities involved in these activities. Ibid. The only legislative history for ECRA is the "Senate Energy and State Energy and Environmental Committee Statement" for Assembly No. 1231-L. 1983, c. 330. See Schmidt, "New Jersey's Experience Implementing The Environmental Cleanup Responsibility Act," 38 Rutgers L.Rev. 729, 744, n. 79 (1986). This statement is included after N.J.S.A. 13:1K-6 and outlines the theory of the Act. For other comments on the Act see generally: Farer, "ECRA Verdict: The Successes and Failures of the Premiere Transaction-Triggered Environmental Law," 5 Pace Envir.L.Rev. 113 (1987); Note, *202 "The Environmental Cleanup Responsibility Act," 8 Seton Hall Leg.J. 331 (1984-1985).
N.J.S.A. 13:1K-8, the definitional section of the Act, delineates those industrial establishments which are subject to the Act, and those cessations, transfers or terminations of operations which trigger the Act. Only businesses which have a Standard Industrial Classification Number (SIC) as set forth in N.J.S.A. 13:1K-8f are subject to the Act. SIC numbers are set forth in a SIC manual prepared by the federal Office of Management and Budget. N.J.S.A. 13:1K-8f. This section also defines the "cleanup plan" which must be approved by DEP when ECRA applies to a particular transaction.
N.J.S.A. 13:1K-9 requires that upon closing or cessation of operations an owner or operator of an industrial establishment must submit either a cleanup plan or a "negative declaration" to DEP. The latter is a statement by the owner, subject to approval by DEP, that there has been no discharge of hazardous substances on the site or that any discharge has been cleaned up in accordance with procedures approved by the Department. N.J.S.A. 13:1K-8a. N.J.S.A. 13:1K-10, as will be discussed in more detail, gave DEP the authority to adopt regulations to implement the Act and directs it to review cleanup plans and negative declarations on a case-by-case basis until such regulations are adopted.
N.J.S.A. 13:1K-11 specifies that the transfer of an industrial establishment is contingent on implementation of the Act, although this section also provides that implementation of a cleanup plan may be deferred upon approval of DEP if the transferee plans to continue the previous use of the property. One commentator tells us that DEP has "flatly refused" to use this provision permitting deferral of cleanup when the use remains the same after transfer. Farer, supra, 5 Pace Envtl. L.Rev. at 124 n. 45. Failure of the transferor to comply with the Act is grounds for voiding the sale or transfer and renders the owner or operator strictly liable for all cleanup and removal *203 costs and all direct and indirect damages resulting from failure to implement a cleanup plan. DEP has the authority to void transactions for failure to submit a negative declaration or a cleanup plan. N.J.S.A. 13:1K-13b.
ECRA became operative on December 31, 1983. L. 1983, c. 330, § 11, see historical note following N.J.S.A. 13:1K-6. On December 30, 1983, DEP filed interim ECRA regulations which were adopted on an emergency basis. 16 N.J.R. 151(a). These regulations were formally promulgated on March 19, 1984 but were still denominated "interim" regulations. With respect to the transactions which triggered the Act  i.e., cessation, termination or transfer of operations  those regulations essentially tracked the statute and did not further define those terms as do the regulations under review here.
During this period when the interim regulations were in effect, DEP became involved in the practice of issuing "letters of nonapplicability" in which DEP declared, after reviewing submissions by the regulated community, that a particular business or a particular transaction was not subject to ECRA. See also In re Robert L. Mitchell Technical Center, 223 N.J. Super. 166, 168-169, 538 A.2d 410 (App.Div.), certif. denied, 111 N.J. 605, 546 A.2d 526 (1988); see Schmidt, supra, 38 Rutgers L.Rev. at 746-748 (1986).
According to DEP, it built on the "general policies and procedures" developed in this process in issuing the regulations under challenge here. The current regulations specifically provide for procedures for obtaining a letter of non-applicability, see N.J.A.C. 7:26B-1.9. In addition, as DEP emphasizes in responding to several of the industry appellants' challenges to specific sections of the regulations, individuals may in many cases seek to obtain a letter of non-applicability even in circumstances where the regulations literally require that a particular business or particular transaction is subject to ECRA. See N.J.A.C. 7:26B-1.5(b)1-6 (various corporate events  e.g., certain sales of stock  trigger ECRA unless the Department determines *204 otherwise pursuant to N.J.A.C. 7:26B-1.9). DEP has repeatedly emphasized to us that the availability of N.J.A.C. 7:26B-1.9 is a regulatory solution which, on the one hand, ensures that no situations potentially subject to ECRA escape environmental review and, on the other hand, prevents the broadly written ECRA regulations from effecting unanticipated factual scenarios not intended by the Legislature or DEP.
These regulations essentially allow a member of the regulated community the opportunity to contend that ECRA should not be applied to a particular business or transaction, but they do not contain any specific criteria for when particular sections should or should not apply. The lack of standards is the weakness in the scheme. The nonapplicability section states in pertinent part:
(a) In order to obtain a determination from the Department concerning the applicability of the Act or this chapter to a specific site ... a person shall:
1. Submit a completed and notarized applicability determination from available from the Department, executed by the owner or operator, to the address specified at N.J.A.C. 7:26B-1.11;
2. Submit the fee set forth at N.J.A.C. 7:26B-1.10 required for applicability determinations;
3. Grant written permission allowing the Department to enter and inspect the site and operations for which the applicability determination is requested pursuant to N.J.A.C. 7:26B-1.12; and
4. Demonstrate, to the Department's satisfaction that the Act or this chapter is not applicable. [N.J.A.C. 7:26B-1.9].
In the context of this nonapplicability section, DEP urges approval of these broadly drafted regulations. We conclude that these expansive "trigger" regulations are acceptable only if appropriate standards in the "nonapplicability" regulation, N.J.A.C. 7:26B-1.9, are adopted. Thus our decision today, in part, directs a remand for formulation of reasonable standards for nonapplicability, as discussed in VI(A) post.

II

Standard of Review for ECRA "Trigger" Regulations
A threshold concern in this matter is the degree of deference to be accorded to DEP's ECRA regulations. The *205 industry appellants argue that because the regulations, or the portions which they challenge, involve business and corporate matters, they are outside the scope of DEP's traditional expertise and are not entitled to a presumption of validity. They also use the same reasoning in part to argue that DEP is without any implied statutory authorization under ECRA to issue these business-oriented regulations.
DEP counters that administrative regulations are entitled to a presumption of validity unless there is a clear showing that there is no statutory authorization for them. DEP also contends that ECRA should be liberally construed, that regulations intended to protect the health and general welfare are generally given a liberal interpretation, and that, contrary to appellants' assertion, ECRA and its regulations are primarily environmental in nature, rather than business-oriented controls.
We conclude that DEP is indeed statutorily authorized to promulgate regulations under ECRA which may define and impact on certain business transactions and that the regulations under challenge here are entitled to the same deference usually accorded by this court to administrative regulations. In re Amendment of N.J.A.C. 8:31B-3.31, 119 N.J. 531, 543-544, 575 A.2d 481 (1990); see A.A. Mastrangelo, Inc. v. DEP, 90 N.J. 666, 683, 449 A.2d 516 (1982), quoting Motyka v. McCorkle, 58 N.J. 165, 181, 276 A.2d 129 (1971) (administrative regulations are customarily afforded a rebuttable presumption of validity).
An administrative agency derives its authority to promulgate regulations from its enabling legislation and, in addition, may be found to have those incidental powers which are reasonably necessary to enable it to accomplish its statutory responsibilities. New Jersey Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 562, 384 A.2d 795 (1978). DEP adopted its regulations pursuant to N.J.S.A. 13:1K-10a:
The department shall, pursuant to the "Administrative Procedure Act," P.L. 1968, c. 410 (C. 52:14B-1 et seq.), adopt rules and regulations establishing: minimum standards for soil, groundwater and surface water quality necessary for the detoxification of the site of an industrial establishment, including *206 buildings and equipment, to ensure that the potential for harm to public health and safety is minimized to the maximum extent practicable, taking into consideration the location of the site and surrounding ambient conditions; criteria necessary for the evaluation and approval of cleanup plans; a fee schedule, as necessary, reflecting the actual costs associated with the review of negative declarations and cleanup plans; and any other provisions or procedures necessary to implement this act. [Emphasis added].
In our view, appellants are unpersuasive in arguing that DEP's regulations are authorized and entitled to deference only when they deal with specifically or uniquely environmental issues, such as soil or groundwater standards. The statute itself expressly gives DEP the power to promulgate such regulations as it believes are necessary to implement the Act and this general language appears to permit both specifically environmental regulations and other regulations which, in the opinion of DEP, are necessary to implement or prevent evasion of the Act. Indeed, DEP has responded to many of appellants' challenges to specific regulations by explaining that they are necessary to prevent attempts at evasion.
Appellants insist that DEP improvidently ventured into the area of business or corporate law in writing the regulations and that the regulations are entitled to no deference. We are not persuaded on this point. The statute on its face is environmentally-targeted legislation which is quite clearly intended to directly, profoundly and significantly affect business decisions concerning cessation of operations, or transfer of operations and land. In giving DEP the authority to administer the statute, the Legislature must necessarily have authorized DEP to draft regulations which to some extent trench on business or corporate matters.
In this vein, New Jersey Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 384 A.2d 795 (1978), is particularly apposite. There, the New Jersey Guild of Hearing Aid Dispensers (Guild) argued that regulations adopted by the Board of Medical Examiners impermissibly extended beyond the scope of health and safety regulation of such practitioners. The applicable enabling legislation sought to regulate the dispensing of hearing *207 aids, authorized the establishment of educational and licensing requirements for dispensers, and enabled the Director of Consumer Affairs to discipline licensees for certain unethical conduct. The Guild urged that regulations which governed the business aspects of hearing aid dispensing were beyond its statutory power. The regulations mandated advance disclosure and itemization in pricing, posting of a retail price on all hearing aids offered for sale, and set price guidelines for dispensing services and equipment. The Supreme Court disagreed with the Guild's position, emphasizing that such an interpretation would run counter to the mandate to liberally construe legislation intended to further the public welfare. Id. at 563, 384 A.2d 795.
This perspective is even more applicable to ECRA. Since the legislation on its face necessarily affects business decisions, we can safely assume that the Legislature intended that DEP might have to define and circumscribe certain business transactions. We conclude that the regulations in issue should be the subject of the same inquiry normally applicable to review of agency action: whether (1) the agency action violates the enabling act's express or implied legislative policies; (2) there is substantial basis in the record to support the findings upon which the agency based the application of legislative policies; and (3) in applying the legislative policies to the facts, the agency clearly erred by reaching a conclusion that could not have been reasonably made upon a showing of the relevant factors. In the Matter of Water Supply Critical Area, 233 N.J. Super. 280, 284, 558 A.2d 1321 (App.Div. 1989), citing Public Service Elec. v. DEP, 101 N.J. 95, 103, 501 A.2d 125 (1985). We conclude that the agency's rulemaking generally meets this test.

III

Parent-Subsidiary Triggers
The first substantive question is whether the regulations impermissibly expand ECRA by imposing responsibility because *208 of changes in a parent corporation which owns an industrial subsidiary. ECRA is triggered by the closing or transfer of operations of an industrial establishment. N.J.S.A. 13:1K-7; N.J.S.A. 13:1K-9. The statute defines "closing, terminating or transferring operations" as,
b. "Closing, terminating or transferring operations" means the cessation of all operations which involve the generation, manufacture, refining, transportation, treatment, storage, handling or disposal of hazardous substances and wastes, or any temporary cessation for a period of not less than two years, or any other transaction or proceeding through which an industrial establishment becomes nonoperational for health or safety reasons or undergoes change in ownership, except for corporate reorganization not substantially affecting the ownership of the industrial establishment, including but not limited to sale of stock in the form of a statutory merger or consolidation, sale of the controlling share of the assets, the conveyance of the real property, dissolution of corporate identity, financial reorganization and initiation of bankruptcy proceedings; [N.J.S.A. 13:1K-8b].
Appellants challenge those portions of DEP regulations which provide that ECRA is triggered by sales, transfers, or dissolutions of a parent corporation which owns or operates a subsidiary which in turn owns or operates an industrial establishment.
N.J.A.C. 7:26B-1.3 ("definitions") defines "closing or terminating or transferring operations" as, "... any change in ownership of the industrial establishment including, but not limited to, transfer by any means of shares of a corporation which results in a change in the controlling interest in the owner or operator...." Analogous provisions in N.J.A.C. 7:26B-1.5 ("applicability") make explicit that transactions at the parent corporation level may trigger ECRA, even though the industrial establishment which may have a hazardous waste problem is owned and/or operated by a subsidiary of the parent corporation, and there is no change in the direct ownership of that subsidiary. N.J.A.C. 7:26B-1.5(b)1, 2, and 6, state as follows:
(b) Unless otherwise provided in this chapter, closing, terminating, or transferring operations includes, but is not limited to, the following events:
1. Sale or transfer of stock in a corporation which directly owns or operates, or indirectly through any of its subsidiaries, owns or operates, an industrial establishment that results in any form of a merger or consolidation, unless the Department determines otherwise pursuant to N.J.A.C. 7:26B-1.9;

*209 2. Sale or transfer of stock in a corporation which results in a change in the person or persons holding the controlling interest of a corporation which directly owns or operates, or indirectly through any of its subsidiaries, owns or operates an industrial establishment, unless the Department determines otherwise pursuant to N.J.A.C. 7:26B-1.9.
....
6. Dissolution of a corporation which directly owns or operates, or indirectly through any of its subsidiaries, owns or operates an industrial establishment, unless the Department determines otherwise pursuant to N.J.A.C. 7:26B-1.9.
Appellants attack both the basic principle that a change at the parent corporation level may trigger ECRA, as well as the regulatory definition of "controlling interest" in N.J.A.C. 7:26B-1.3 which DEP has developed to implement this principle.
Turning to the basic principle first, appellants insist that the Legislature intended ECRA to apply only when the direct ownership of an industrial establishment changed. They contend that the statute itself consistently refers to decisions or actions by an owner or operator of an industrial establishment as triggers for ECRA and cite, for example, N.J.S.A. 13:1K-8b, which states that closing, termination or transferring operations includes "any transaction ... through which an industrial establishment ... undergoes ... change in ownership" (emphasis added). They also rely on N.J.S.A. 13:1K-9, which imposes ECRA obligations on an owner or operator of an industrial establishment who plans to close, sell or transfer operations. Appellants emphasize that the statutory focus is always on the industrial establishment and never on a corporation which indirectly owns such an establishment. They also insist that the regulations are an improper attempt to "pierce the corporate veil" of a parent corporation which has an industrial establishment as a subsidiary.
DEP responds that the regulation is necessary to prevent circumvention of ECRA  a point which it emphasized both in its brief to us and in its responses to comments to these rules when proposed. DEP more explicitly explained this theory in those comments: it noted that the sale of stock of a parent corporation results in a change of ownership not only of the *210 industrial establishments owned by that parent corporation but also changes the ownership of industrial establishments owned by any of the parent's subsidiaries. "A different result would allow for ECRA avoidance through the establishment of shell subsidiary corporations that never transfer an industrial establishment but are, themselves, transferred with the industrial establishments that they own." The comment thus seems to be directed, not at a typical, pre-existing parent-subsidiary relationship but at a situation where an industrial establishment "splits itself" into a parent and a subsidiary and the transfer of the industrial establishment is effected through the sale of a newly-created parent.
DEP also contends that appellants ignore the fundamental precept of corporate law that corporate shareholders are the equitable owners of corporate property and that a change in those shareholders changes the ownership of the property. DEP further emphasizes that N.J.A.C. 7:26B-1.9, the non-applicability "safety valve" regulation, allows a corporation to demonstrate that a change in a parent corporation does not affect a subsidiary owning an industrial establishment. In a related argument, DEP suggests it inappropriate for us to review the validity of these regulations by evaluating certain hypotheticals presented by appellants. Instead, DEP suggests that a corporation or individual which believes that a literal application of the regulations to them would contravene the spirit of ECRA should pursue the letter of non-applicability process available in N.J.A.C. 7:26B-1.9 and then seek judicial review of that determination, if unsatisfactory.
The Legislature seems to have been groping for a rather expansive definition of "closing, terminating or transferring operations" when it included within that clause the phrase "change in ownership" of an industrial establishment, and then specified, in turn, that that term included, but was not limited to, stock sales resulting in statutory mergers or consolidation, sale of the controlling share of the assets, dissolution of the corporate identity, financial reorganization and initiation of *211 bankruptcy proceedings. N.J.S.A. 13:1K-8b. The definition surely seems intended to trigger ECRA in situations beyond the physical closing or actual transfer of a physical plant (the clear-cut cases), presumably to ensure that a cleanup plan could be initiated, if necessary, before financial changes in the corporation deprived it of its ability to pay for the cleanup.[1] Contrary to appellants' suggestion, certain of these transactions  e.g., stock sales resulting in statutory mergers, bankruptcy proceedings, financial reorganization  usually have no more direct impact on the actual day-to-day physical operation of an industrial establishment than would transactions affecting a parent corporation which owns a subsidiary which operates an individual establishment. The statutory phrase "changes in ownership in an industrial establishment" does not necessarily or readily encompass changes in a corporation which in turn owns the entity which operates the industrial establishment. These changes, without any indication of the relationship between a parent and a subsidiary in the particular case, would not self-evidently, necessarily, or even presumptively affect the subsidiary.
The rule in the general corporate context seems to be that a holding corporation may be regarded as the owner of the property of a subsidiary only when it has used its stock ownership in the subsidiary to dominate or control its management. 1 Fletcher, Cyclopedia of the Law of Private Corporations (1990 Rev.Ed.), § 43 at 734. Applying this principle to present circumstances, a change in ownership at the parent *212 corporation level would constitute a "change in ownership" of a subsidiary only if the parent had dominated or controlled the subsidiary's affairs. On the other hand, since some of the events which are specified by the statute as ECRA triggers  initiation of bankruptcy proceedings, financial reorganization  do not constitute a change in ownership in the traditional sense, this point would not seem to be determinative. In addition, by specifying that a change of ownership includes, but is not limited to, the events listed in the statute, the Legislature virtually invited DEP to determine what other types of financial or corporate events might constitute a change in ownership. Moreover, DEP's conclusion, based on its experience in administering the Act, that the parent-subsidiary rule concerning change in ownership was necessary to prevent circumvention of the Act, is a mixed legal-environmental professional judgment which is entitled to a presumption of correctness. Cf. American Cyanamid v. DEP, 231 N.J. Super. 292, 315, 555 A.2d 684 (App.Div.), certif. den. 117 N.J. 89, 563 A.2d 847 (1989) (facts sufficient to justify a rule are presumed), and Matter of Fabritex Mills, Inc., 231 N.J. Super. 224, 230, 555 A.2d 649 (App.Div. 1989) (language in N.J.S.A. 13:1K-8b that ECRA applied to the cessation of all operations construed sensibly to mean "substantially all" operations, otherwise owner could evade compliance simply by continuing minimal storage at the site).
Moreover, any danger that DEP is over-reaching its legitimate statutory authority by this regulation can be mitigated by N.J.A.C. 7:26B-1.9 (with appropriate standards), which allows a business to demonstrate that a transaction which might fall within the literal scope of the regulations should nevertheless not be subject to ECRA. The importance of this type of mechanism has been acknowledged by us. Cf. In re Robert L. Mitchell Technical Center, supra, 223 N.J. Super. at 173, 538 A.2d 410, where we rejected an argument that ECRA did not apply to a facility which was only an auxiliary to an industrial establishment. We reasoned that the Legislature was aware that ECRA might encompass non-toxic sites and therefore *213 provided for letters of negative declaration. Ibid. We held that ECRA was applicable to the facility but emphasized that if the site presented no hazard, "a convenient alternative" to compliance existed through the letter of non-applicability process. Ibid. The same reasoning pertains here.
The fear that ECRA may be circumvented should not be used by DEP as a justification for impermissibly expanding the statute or advancing environmental goals not embraced by the Legislature. However, we conclude that a comparison of the situation here with that in Matter of Freshwater Wetlands Rules, 238 N.J. Super. 516, 570 A.2d 435 (App.Div. 1989), where we found that DEP did go beyond an enabling statute, demonstrates why this regulation is not vulnerable to challenge on this basis.
In Matter of Fresh Wetlands Rules we invalidated a regulation which had limited a statutory exemption from wetlands compliance for all projects which had received preliminary approval under the Municipal Land Use Law and for which a subdivision application had been submitted prior to 1987. DEP had theorized that the exemption should extend only to those projects which were actually initiated within five years, on the grounds that a developer could obtain preliminary approvals and then "sit on them" with no intention of actually building until 20 years later. We agreed with DEP's analysis and fears but pointed out that the Legislature must have been aware of this fact and if it had intended to limit "grandfathering" permits to five years, it would have done so expressly. Id. at 530, 570 A.2d 435.
The situation before us is quite distinct. While appellants contend that the parent-subsidiary regulation goes beyond the enabling statute, the enabling statute itself is broad, includes within the term "change in ownership" events not normally construed as such, and, by specifying that change in ownership "includes but is not limited to" the enumerated events, contemplates that DEP could reasonably determine what other types of transactions might constitute a change in ownership for *214 ECRA purposes. This is not a situation where DEP's regulations contravene a specific statutory provision, as in Matter of Freshwater Wetlands Rules.
This analysis is not changed by appellants' corporate veil argument. DEP persuasively points out that "piercing the corporate veil" is commonly understood as the imposition of common-law liability on individual corporate shareholders or, in some circumstances, on a related corporation. DEP v. Ventron Corp., 94 N.J. 473, 500, 468 A.2d 150 (1983). The regulations here do not impose liability in this manner: instead they view certain transactions not involving the entity which immediately owns or operates an industrial establishment as triggering the need for the industrial establishment itself to take certain actions. But appellants have a sound point when they emphasize that the ECRA presumption that certain extra-corporate transactions affecting an independent industrial establishment deviates from the traditional respect accorded to the integrity of the corporate form. However, Ventron illustrates that, even where the traditional requirements for piercing a corporate veil are not present, a statute may nevertheless impose liability on one corporation based on the actions of a related corporation.
Ventron involved a suit by DEP against several corporations in which DEP sought to compel them to pay for the cost of cleanup and removal of mercury pollution from a tract of land where seepage had polluted a creek. One of the many issues addressed was whether liability could be imposed under the Spill Act, N.J.S.A. 58:10-23.11 to -23.11z, on one of the corporations, Velsicol, for the actions of Wood Ridge, a subsidiary of Velsicol. 94 N.J. at 500, 468 A.2d 150. While ultimately concluding that there was a statutory basis for imposition of such liability on Velsicol, the Court disagreed with this court's piercing of Wood Ridge's corporate veil. The Supreme Court emphasized that except in cases of fraud, injustice, or similar circumstances, courts will not pierce a corporate veil, and further observed that while dominance of a subsidiary by a *215 parent corporation may be an additional ground for such an action, a corporate veil will usually not be pierced unless the parent "abused the privilege of incorporation by using the subsidiary to perpetrate a fraud or to circumvent the law." Id. at 500-501, 468 A.2d 150.
In accordance with these principles, the Supreme Court found that there was an insufficient basis to pierce Wood Ridge's corporate veil merely because Velsicol had created Wood Ridge for the sole purpose of acquiring and operating the mercury business which apparently had generated the pollution. Id. at 501, 468 A.2d 150. The Court stated that "[c]ontrary to the implication of the trial court opinion, it is proper to establish a new corporation for the sole purpose of acquiring the assets of another corporation and continuing its business," and that Wood Ridge was therefore not created for an unlawful purpose. Ibid. However, the Court proceeded to rule that Velsicol was nonetheless liable under the Spill Act, which imposed liability on "anyone responsible" for pollution. Ibid. After noting that Velsicol was aware of and permitted certain dumping of waste material by Wood Ridge, and that it was constantly involved in the subsidiary's activities, the Court found that Velsicol could fairly be said to be responsible under the terms of the Spill Act.
In a statement which recognizes DEP's concern about the evasive potential of shell subsidiaries, the Court said that the Legislature, in enacting the Spill Act, intended that the privilege of incorporation should not, under the circumstances of the case, become a device for avoiding statutory responsibility. "A contrary result would permit corporations, merely by creating wholly-owned subsidiaries, to pollute for profit under circumstances when the Legislature intended liability to be imposed." Id. at 502-503, 468 A.2d 150.
To an extent, Ventron provides support for the general proposition that the activities of one corporation are not usually relevant to or determinative of the obligations or liabilities of another, related corporation. Recognized authority is in accord. See 1 Fletcher, supra, § 43 at 734 (parent is not usually liable *216 for the obligations of the subsidiary absent finding of control and dominance, or agency relationship). To the extent these DEP-ECRA regulations are viewed as imposing regulatory responsibilities on an industrial establishment based on the activities of an independent corporation, they may be a deviation from this principle. But Ventron also illustrates that this result is not impermissible if an enabling statute specifically authorizes this result or if ECRA can be reasonably construed to direct or authorize promulgation of regulations which authorize this result, as we conclude it does.
We conclude that ECRA does authorize the regulations in question, because it in effect defines change of ownership to encompass events which could affect a corporation's financial ability to clean up hazardous wastes and does not limit the term to the transfer of the actual physical plant. Further, ECRA implicitly authorizes DEP to determine what transactions, in addition to those listed in the statute, should constitute a relevant change in ownership. The Spill Act, as construed in Ventron, imposed extra-corporate liability only after review of the particular circumstances which there led the Court to conclude that the parent-corporation was "responsible" under the terms of the statute for the pollution. In a similar vein, N.J.A.C. 7:26B-1.5 and N.J.A.C. 7:26B-1.9, with appropriate standards, allow a corporation the opportunity and latitude to demonstrate to DEP that ECRA considerations are irrelevant and should not apply to a particular parent-corporation transaction. These regulations thus provide sufficient discretion to the agency to guard against the harshness or arbitrariness which might result if the corporate form were automatically and totally disregarded. We sustain this portion of the regulations from the attack on this theory.

IV

Regulation Defining "Corporate Reorganization"
The next question is whether the definition in DEP's regulations of "corporate reorganization not substantially affecting *217 the ownership of the industrial establishment" narrows the statutory exclusion from ECRA too much. N.J.S.A. 13:1K-8b provides that a corporate reorganization not substantially affecting the ownership of the industrial establishment is not a change in ownership which triggers ECRA. DEP's implementing regulation for this provision, included in the "definitions" section of N.J.A.C. 7:26B-1.3, states as follows:
"Corporate reorganization not substantially affecting ownership" means the restructuring or reincorporation by the board of directors or the shareholders of a corporation, which does not diminish the availability of assets for any environmental cleanup, diminish the Department's ability to reach the assets, or otherwise hinder the owner's or operator's ability to cleanup the industrial establishment, and where the purpose is merely as set forth in 1 to 3 below.
1. To correct illegalities or defects in the original incorporation;
2. To broaden the scope of the powers of the organization including the amendment as well as extension or revival of charters or;
3. To reorganize for any other reason related to financial, administrative, or managerial convenience, or for any other legitimate business purpose.
Appellants contend that there is no statutory basis for the requirements that there be no diminution in the assets available for environmental cleanups and no reduction in DEP's ability to reach those assets. They insist that the statute requires only that the corporate reorganization not substantially affect ownership and does not impose any financial criteria on the reorganization. They also maintain that the regulation is "so broad" that it is unclear what criteria a corporation must satisfy in order to fall within the scope of the regulation.
DEP responds that the financial provisions in the regulation are necessary to further the core purpose of the statute  preventing the abandonment of hazardous wastes. In responses to comments during the rulemaking process DEP described an example of a corporate reorganization, the creation of a spin-off corporation, which, while it might not substantially affect ownership in the colloquial sense, might impede an environmental cleanup. DEP reasoned that if the spin-off corporation were a foreign corporation, DEP would find difficulty reaching those assets. DEP also points out that the regulation is not impermissibly broad or vague because a corporation may always *218 pursue the letter of nonapplicability process (N.J.A.C. 7:26B-1.9), assuming again the existence of appropriate standards, if it is uncertain whether a reorganization meets the criteria in N.J.A.C. 7:26B-1.3. We conclude that the regulation must be sustained and is completely consistent with the statute.
At first glance, it might seem that DEP is narrowing the statutory exclusion from ECRA for corporate reorganizations by imposing certain financial criteria, when the statute speaks only of a "corporate reorganization not substantially affecting ownership." But as discussed above, the statutory definition of change in ownership is broad and includes financial changes in an entity, not simply the transfer of shares of stock or the transfer of a physical plant. Indeed, since the statute specifically includes a "financial reorganization" as among the events which constitute a change in ownership, N.J.S.A. 13:11-8b, we conclude that it appears necessary to define a corporate reorganization not substantially affecting ownership as one which does not entail significant changes in the financial ability of a corporation to comply with ECRA. We sustain this portion of the attack on the regulations.

V

Regulation Defining "Controlling Interest"
N.J.A.C. 7:26B-1.3 defines "controlling interest," a term not used in the statute, as:
... the interest held by the person or persons who own more than 50 percent of the issued and outstanding stock of a corporation; it also means the interest held by the person or persons who own 50% or fewer of the issued and outstanding stock of a corporation and who possess, directly or indirectly, the power to direct or cause the direction of the management and policies of a corporation.
This definition becomes operative under N.J.A.C. 7:26B-1.5(b)(2), which states that ECRA is effective upon:
Sale or transfer of stock in a corporation which results in a change in the person or persons holding the controlling interest of a corporation which directly owns or operates, or indirectly through any of its subsidiaries, owns or *219 operates an industrial establishment, unless the Department determines otherwise pursuant to N.J.A.C. 7:26B-1.9.
Under this definition, ECRA is triggered by a sale which results in a change in the controlling interest of a parent corporation, and applies as well when a controlling interest in the subsidiary's stock is sold. To situate N.J.A.C. 7:26B-1.5(b)(2) in the overall statutory and regulatory framework, this subsection represents a DEP addition to the definition of "change in ownership," N.J.A.C. 7:26B-1.3, which phrase is included by statute within the phrase "closing, terminating or transferring operations"  the basic ECRA triggers. N.J.S.A. 13:1K-8b. Appellants attack the controlling interest concept and the definition itself.
Appellants' main objections are that the regulation does not specify what types of stock are to be included in determining controlling interest transfers, preferred or common, and whether it is 50% of the value of the stock or the physical number of shares, which triggers the Act. They also contend that it is contrary to corporate law to trigger ECRA when there is a sale by a group of persons which own less than 50% of the stock of a corporation but which indirectly or directly has the power to direct or cause the direction of the management and policies of a corporation. They insist that no individual shareholder, as a shareholder, ever possesses such power.
DEP responds that the 50% test is reasonable, consistent with other regulatory schemes, and is implemented in conjunction with N.J.A.C. 7:26B-1.9, which allows a corporation to demonstrate that some 50% sales do not trigger the statute. DEP reasons that what class or classes of shares are to be focused upon in applying the 50% test will depend on the particular facts and circumstances of a case. Finally, DEP insists that shareholders always have the power to assert indirect control over a corporation, so that the less-than-50% section of the regulation is not automatically invalid. DEP points out that possession of a minority controlling interest is used as a trigger *220 in a variety of regulatory schemes. We find DEP's analysis persuasive.
Preliminarily, since corporations, other than very small ones, will frequently "change ownership" other than by means of a "lock, stock, and barrel" sale, and the sale of a bulk of the stock would affect the overall ownership of a corporation, a regulation defining a "controlling interest" is one which reasonably can be considered necessary to implement ECRA, in light of the fact that change of ownership is an ECRA trigger. We find the specifics of the regulation are sustainable, especially when coupled with the inapplicability "safety valve" provisions in N.J.A.C. 7:26B-1.9, again assuming appropriate standards to control use of that section.
First, we find it reasonable to use a sale of more than 50% of the stock of a corporation as a "bright line test" which creates the presumption that ECRA applies. As DEP points out, percentage requirements of 50% or less have been used in other regulatory schemes: See, e.g., 16 C.F.R. 801.1(b) (50% test applied in the rules regarding premerger notification under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, 15 U.S.C.A. § 18a); 12 C.F.R. 574.4 (25% used as regulatory measure of acquisition of control of an insured institution under the Change in Savings & Loan Control Act, 12 U.S.C.A. § 1817(j), and the Savings & Loan Holding Company Act, 12 U.S.C.A. § 1467(a)). Contrary to appellants' claim, we find that the failure to specify the precise type or class of stock (common, preferred and so on) in the regulation does not render the provision ambiguous. By stating that a sale of more than 50% of all the issued and outstanding stock is an ECRA trigger, the regulation appears to intend to aggregate all the stock of the corporation and then apply the test. If the regulation had intended that the test be 50% of the value, as opposed to 50% of the total number of shares of stock, it presumably would have said so. If, because of the particular mix of classes of stock, a sale of 50% or more of all the stock in a corporation is not analogous to a change in ownership, the corporation has the *221 opportunity to so demonstrate inapplicability. N.J.A.C. 7:26B-1.9.
Second, without merit, in our view, is appellants' argument that there is some confusion in the regulation because it does not suggest when the 50% test is to be applied. Regulations are to be read sensibly to avoid an absurd result. If the regulation does not require aggregation of sales over a specific time period, then the 50% trigger must logically be read as applying to block sales in this amount, not staged or incremental sales. Cf. N.J.A.C. 7:26B-1.3 which establishes a five-year period since 1983 for aggregating sales to determine whether there has been a "sale or transfer of the controlling share of a corporation's assets" outside the ordinary course of business. See N.J.A.C. 7:26B-1.5(b)(3).
Appellants' challenge to the portion of the regulation triggering ECRA when there is a sale of only a minority stock interest but there is then a change in the person or persons who have the power directly or indirectly to manage the policies of the corporation is not persuasive. Appellants are incorrect in asserting that a shareholder never has the power to manage or control a corporation. Fewer than a majority of the shareholders of a corporation can effectively exercise control through the officers and board of directors. See Henn, Corporations, Cases and Materials 326 (1975), quoting A. Berle & G. Means, The Modern Corporation and Private Property 80-81 (1932). That classic viewpoint explains that a small group may have working control of a company when it has a substantial minority stock interest and is able to attract additional proxies to secure a majority vote on various decisions. Ibid. In addition, while a shareholder qua shareholder may not have direct authority to influence the policies of a corporation, the shareholder certainly has indirect power to do so. Further, in close corporations, in which voting shares are held by a single shareholder or a closely knit group of shareholders, those shareholders are often quite active in the management of the *222 enterprise. 1A Fletcher, supra, § 70.1 at 4. Thus, a sale of a substantial minority interest, held by a shareholder active in the corporation's management, could have a substantial impact on the policies and management of the corporation, tantamount to the change in ownership which triggers ECRA.
Finally, appellants offer the example of a lender which obtains an equity interest in a corporation in exchange for financing and seem to suggest that while this transaction might be viewed as a change in ownership under the regulations, neither party to such a transaction intended such a result. Again, we think this is a situation which could be presented to DEP under N.J.A.C. 7:26B-1.9, with standards, and does not provide in itself a basis for invalidating the regulations.
One possible problem with this definitional regulation, although appellants do not raise it specifically, is that a corporation might be confused or uncertain as to when there has been a sale of a minority interest which might trigger ECRA and which therefore requires it either to comply with the statute or seek a determination of non-applicability. While this argument can be made in a vacuum, we think in the "real world" a corporation's management and counsel would know if there had been a sale of stock by a person or persons who own less than 50% of a corporation's stock but who "possess, directly or indirectly, the power to direct or cause the direction of the management and policies of a corporation." This description would typically include either a director or officer who held stock or a shareholder in a close corporation who was in fact active in its management.
The regulations may be uncertain in some specific applications. Indeed, they may be perceived as much too rigorous by the regulated community. These are not sound reasons for us to denounce the regulation. This is especially true where N.J.A.C. 7:26B-1.9, with proper standards, operates as an administrative safety valve and the agency's use of discretion is always subject to judicial review. If the regulations turn out to *223 be simply unworkable and economically stifling as applied to the regulated community, the traditional remedies, the electoral process or the amendment process, directed to the politically responsible branches, legislative and executive, is always available.

VI

Regulation Defining "Cessation of All Operations"
The next question is whether DEP's regulatory definition of cessation of operations to include "substantially all" operations is inconsistent with ECRA. N.J.A.C. 7:26B-1.3 defines "closing, termination or transferring operations" as "cessation of all or substantially all the operations of an industrial establishment, for a period of not less than two years, which involve the generation, manufacture, refining, transportation, treatment, storage, handling, or disposal of hazardous substances and wastes." Another section of N.J.A.C. 7:26B-1.3 defines "cessation of all or substantially all the operations" of an establishment as a 90% reduction in the number of employees, area of operations, or units of product output, in ECRA operations. N.J.A.C. 7:26B-1.5(b)(15) must be read in conjunction with these provisions. It specifies that, except for the cessation of operations for health and safety reasons, see VII, a cessation of operations does not trigger ECRA unless it is for two years or more.
Appellants argue that there is no basis for using the concept "substantially all" operations when the statute itself refers to cessation of "all" operations. They also cite various examples where a 90% reduction in one of the areas listed in the regulations would not, as a practical matter, constitute a cessation of operations. DEP responds that the basic concept embodied in the regulations was sustained in Matter of Fabritex Mills, Inc., supra, and we essentially agree. Fabritex Mills is instructive in evaluating both the propriety of the "substantially all" concept used in the regulations and appellants' attack on the *224 tests used in the regulations to determine when there has been a cessation of substantially all operations.
In Fabritex a corporation appealed from a final DEP order that it had to comply with ECRA, arguing that while it had ceased manufacturing operations at its facility, it continued to store hazardous substances at the location, and there was thus no cessation of operations under the statute. 231 N.J. Super. at 226-227, 555 A.2d 649. DEP claimed that ECRA should be construed to apply when "substantially all" operations at a location are terminated, and referred to its 1987 regulations which so stated but which were not in effect when the administrative action at issue in the case was taken. Id. at 228-229, 555 A.2d 649. While finding it unnecessary to rule on the validity or applicability of DEP's 1987 ECRA regulations, id. at 230, 555 A.2d 649, we held that the statutory phrase "all operations" must be construed sensibly to mean "substantially all" operations, to avoid a situation where the owner of an industrial facility could evade ECRA compliance merely by leaving a few storage barrels on the site. Id. at 230-231, 555 A.2d 649. At the same time, however, we cautioned that DEP's interpretation of the statute "predicated on the disjunctive listing of various types of operations, is subject to the same sort of objection [that had been raised by DEP] against interpreting a statute so literally that its purpose is defeated." Id. at 230, 555 A.2d 649. We offered the example of a facility which totally ceased storage of hazardous substances but continued the manufacture of such materials. We reasoned that the cessation of a minor portion of a business operation would not seem to be a rational reason to invoke ECRA. Ibid.
Fabritex conclusively supports DEP's position that ECRA is triggered by a cessation of "substantially all" operations. However, the danger we perceived in the more specific sections of the prior regulations is present in the current regulations because a 90% reduction of employees or production in one facet of a business dealing with hazardous substances, *225 would not necessarily approach a cessation of "substantially all" of its total operations. However, we think N.J.A.C. 7:26B-1.9, with standards, mitigates this problem, and allows a company to demonstrate without too much inconvenience that a discontinuance of one minor sub-operation should not trigger ECRA. By providing a "bright-line" 90% test for when a business must either comply with ECRA or seek a determination of non-applicability, the regulation is not onerous or problematic, In re Robert L. Mitchell Technical Center, supra, 223 N.J. Super. at 173, 538 A.2d 410, and does not effect so broad a reach that it defeats the purpose of the statute. Fabritex, supra, 231 N.J. Super. at 230, 555 A.2d 649. We reject appellants' challenge on this point.

VI(A)

Standards Needed for Nonapplicability Provision, N.J.A.C. 7:26B-1.9
In the preceding sections of this opinion  III, IV, V and VI  we have reviewed and upheld several sections of the ECRA regulations subject to a recasting of the nonapplicability section, N.J.A.C. 7:26B-1.9, by the agency with reasonable standards. We conclude that some kind of common-sense exceptions are necessary for the rational administration of these broadly-framed regulations. As N.J.A.C. 7:26B-1.9 presently stands, the applicant must "demonstrate to the Department's satisfaction that the Act or this chapter is not applicable." The term "satisfaction" standing alone is not very objective, especially in view of the normal and understandable tension between the business-oriented applicant and the environmentally-oriented regulator processing the plea for exemption.
We conclude that the challenged regulations discussed in III, IV, V and VI can be upheld only if the DEP develops and promulgates reasonable standards for the nonapplicability section, N.J.A.C. 7:26B-1.9, so that the regulated community has some guidance for conduct and the regulator has some structure *226 for the fair administration of its sound exercise of discretion.
We cannot make any precise recommendations as to content. The DEP might well want to articulate a desire to exempt entities or transactions where "triggering" activity would not result in any material changes in New Jersey operations, would not weaken the ability of the company to ultimately comply with ECRA or other environmental mandates, or would be so formalistic as to have utterly no consequence relevant to the Act. These decisions are left to the presumed expertise of the agency. Of course, the standards must include a reasonable time limit for the agency to act on any application for nonapplicability.
We do not perceive our mandate in this regard too onerous for the agency to bear. The DEP is familiar with standards for such waivers in other contexts. Indeed, the ECRA regulations themselves contain rather detailed standards for the "De Minimis Quantity Exemption" section, N.J.A.C. 7:26B-10.1 ("Sub-chapter 10: De Minimis Standards").[2]
*227 Moreover, the regulations adopted pursuant to the Pinelands Protection Act, N.J.S.A. 13:18A-1 to -49, L. 1979, c. 111, contain a detailed section dealing with "waiver of strict compliance with provisions of the comprehensive management plan," N.J.A.C. 7:50-4.61 to -4.67. A specific section of this subchapter deals with these standards; N.J.A.C. 7:50-4.66 quite literally *228 "spells out" when the DEP will deem the Pinelands Preservation regulations too onerous and waive them.[3] The problem of *229 exemptions from complex regulatory schemes is a continuous and vexing one. See 1 Davis, Administrative Law Treatise § 6.30 at 593-596 (1978 and 1989 Supp.). But we require the DEP to have a more articulate standard for its exemption to ECRA than its own "satisfaction," the only standard in current N.J.A.C. 7:26B-1.9. We remand to DEP to draft and promulgate standards for the application of N.J.A.C. 7:26B-1.9 within 90 days because this "safety-valve" section is critical to the survival of the portions of the regulations challenged and upheld in III, IV, V and VI, subject to adoption of appropriate standards in subsection 1.9.

*230 VII

Closures for Health or Safety Reasons Under N.J.S.A. 13:1K-8b
Appellants challenge the regulatory definition implementing the underscored language in N.J.S.A. 13:1K-8b as too broadly interpretative:
... "closing, terminating or transferring operations" means the cessation of all operations which involve the generation, manufacture, refining, transportation, treatment, storage, handling or disposal of hazardous substances and wastes, or any temporary cessation for a period of not less than two years, or any other transaction or proceeding through which an industrial establishment becomes nonoperational for health or safety reasons or undergoes change in ownership. [Emphasis supplied].
The regulation defines the phrase as follows: "[a]ny transaction or proceeding, including but not limited to explosions, fires or other similar events, through which an industrial establishment becomes nonoperational for health or safety reasons." N.J.A.C. 7:26B-1.3. This definition is limited by N.J.A.C. 7:26B-1.5(b)14, which states that ECRA is applicable to explosions, fires, or other similar events where an establishment becomes nonoperational and "the Department determines that there has been a significant discharge or release of hazardous substances and wastes." The definition was modified from the originally proposed rules, where DEP had proposed that the definition of "closing, terminating or transferring operations" include any "incident, transaction or proceeding through which an industrial establishment becomes non-operational for health or safety reasons." By deleting the word "incident," DEP acknowledged that short-term closings  it offered the example of a three-hour shut-down due to a worker's injury  obviously were not subject to ECRA.
Appellants contend that the "proceeding" which the Legislature intended to be analogous to a closing or termination of operations was a legal proceeding in which the establishment was declared unfit for operation and that by placing the word "or" between "transaction or proceeding" in N.J.S.A. 13:1K-8b, *231 the Legislature intended that the word "transaction" be applied only to the phrase "or undergoes change in ownership."
In terms of a linguistic level of analysis, appellants insist that it is meaningless to describe a transaction or proceeding as a fire, explosion or similar event. On a more substantive level, they reason that an explosion or fire which results in a hazardous discharge is more appropriately remedied by DEP under the Spill Act, that ECRA is transactional in nature, and is intended to apply only upon sale or closure of an industrial establishment.
First, we basically concur with appellants' analysis. In reading the definitional section in N.J.S.A. 13:1K-8b as a whole, we conclude that the phrase "any other transaction or proceeding through which an industrial establishment becomes nonoperational for health or safety reasons or undergoes change in ownership" is best parsed to mean that ECRA applies to a "proceeding" in which an industrial establishment becomes non-operational, or a "transaction" through which it undergoes a change in ownership. It strains the ordinary use of language to speak of a "transaction" as one in which an establishment becomes non-operational for health and safety reasons. "Transaction" has been defined as the act of conducting business. Black's Law Dictionary (5th Ed. 1979).
Second, we agree with appellants that it is extremely curious to describe a fire or explosion as a "proceeding" through which an establishment becomes non-operational for health or safety reasons. "Proceeding" has been defined as the "form and manner of conducting judicial business before a court or judicial officer." Black's Law Dictionary, supra, at 1368. Even the primary non-legal definition of "proceeding" is "procedure" in the sense of an organized determination, judicial or not. Webster's International Dictionary 678 (7th ed. 1971). While a fire or explosion may well be the animating reason to close a facility for health or safety reasons, we conclude that it is the *232 official determination of that closure which the Legislature intended to trigger ECRA.
Moreover, viewing the definitional section in the statute as a whole, we note that the general definition of "closing" specifically includes a "temporary" closing for a period of not less than two years. N.J.S.A. 13:1K-8b and N.J.A.C. 7:26B-1.5(b)(14). Thus, under the statute, temporary closings due to fires or explosions or any other reason, which extend two years or more, would trigger ECRA, while similar closing for a lesser period would not. The closures for health and safety reasons specified by the statute were intended to encompass closures which are ordered by a court or regulatory agency and cannot, consistent with the statute, afford another means by which ECRA can be applied by DEP to temporary closings for periods of less than two years. We also note that the regulatory definition of "temporary closing" excludes the closures for health or safety reasons described in N.J.A.C. 7:26B-1.5(b)(14). To this extent, the regulation is invalid.

VIII

Sales of Partnerships Triggers
The next challenge relates to ECRA compliance upon certain sales of partnerships. N.J.A.C. 7:26B-1.5(b)10 states that ECRA is triggered upon the "[s]ale or transfer of the entire interest of any partner in a general partnership, the entire interest of a general partner in a limited partnership, or the entire interest of a limited partner in a limited partnership liable for the obligations of a limited partnership, as provided in N.J.S.A. 42:2-9, 42:2-11 and 42:2A-27, such partnership or limited partnership owning or operating an industrial establishment." DEP presumably determined that any of these transactions constituted a transfer (or perhaps a change of ownership in the context of an industrial establishment owned by a partnership). Perhaps significantly, unlike other sections of the regulations defining ECRA triggers, N.J.A.C. 7:26B-1.5(b)10 *233 does not allow an entity to demonstrate, under N.J.A.C. 7:26B-1.9, that ECRA should not apply in a particular circumstance. The DEP did concede at oral argument that this failure to render the inapplicability section available to partnership transactions was inadvertent and would be rectified administratively.
Appellants contend that this regulation is inconsistent with ECRA itself, because the sale of a general partnership interest  which might constitute only a 5% share in the profits and management of the partnership  is not a change in ownership. They insist that, just as a 5% sale of the shares of stock in a corporation does not trigger ECRA, a sale of a similar size interest in a partnership should not trigger ECRA either.
DEP responds that since a partner is a co-owner of partnership property, triggering ECRA upon the sale of a partner's interest is consistent with the provisions of the statute which require compliance upon the sale or transfer of an industrial establishment. DEP further reasons that since partners are responsible for the liabilities of the partnership, making ECRA applicable upon the sale of a partnership interest furthers the legislative policy of preventing abandonment of hazardous sites.
A starting point for analyzing these arguments is DEP's responses to comments to its proposed rules. In reply to a suggestion that partnerships should not be treated differently from corporations, DEP noted that "[I]n a general partnership, except as otherwise provided by the partnership agreement, the partners share the profits and losses as well as the management equally, though their capital contributions vary. Each general partner has an ownership interest in the partnership and is an owner or operator of the industrial establishment." DEP reasoned that since each general partner is an owner of an industrial establishment, and subject personally and fully to ECRA responsibilities, a sale of a general partnership interest should trigger ECRA. DEP rejected the suggestion of one commentator that the regulation be revised to trigger ECRA *234 only upon the sale of a general partnership interest to a third party not currently a partner, or sale of the entire interest of any general partner with more than a 50% interest in the partnership. DEP responded that: "The Act is triggered when there is a change in ownership of the industrial establishment. If a general partnership owns the industrial establishment, the transfer of a general partner's entire interest in the partnership, no matter how small, is an ECRA trigger."
DEP does not dispute that a general partnership interest may be relatively small  appellants use the example of a 5% interest in profits  but DEP does not precisely explain why the sale of a general partnership interest in such a small percentage is a change in ownership under the Act. The implicit rationale, as discerned from the above-quoted comments, seems to be that since a general partner is jointly and severally liable for all partnership debts and obligations, N.J.S.A. 42:1-15, the withdrawal of a general partner could substantially impact on the ability of the partnership to eventually comply with ECRA.
While we think that many aspects of DEP's analysis and approach are correct, and we are not persuaded by appellants' overall analysis, we are concerned that the absence of a "safety valve" makes the regulation unduly stringent, and that DEP's comments concerning partners' liability and ownership of partnership property, as they relate to the concept of change of ownership, may not be entirely accurate. A sale of a partner's entire interest in a partnership is a dissolution of a partnership under N.J.S.A. 42:1-29, defining that term as "the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business."[4]N.J.S.A. 42:1-41 *235 provides that the business of the dissolved partnership may be continued without liquidation and generally provides that the creditors of the dissolved partnership are also the creditors of the person or partnership continuing the business. Wilzig v. Sisselman, 182 N.J. Super. 519, 527, 442 A.2d 1021 (App.Div. 1982). Nevertheless, while a partnership business may be continued after the withdrawal of a partner, the existing liability of any partner is not discharged, although this may be effected by agreement between the withdrawing partner, the entity continuing the business, and the partnership creditor. N.J.S.A. 42:1-36. In the absence of such an agreement, a person admitted as a partner into an existing partnership is liable for all the obligations of the partnership arising before admission thereto as though the person was a partner when such obligations were incurred, except that this liability shall be satisfied only out of partnership property. N.J.S.A. 42:1-17. In other words, the new partner does not have the personal liability that is typical of general partners with respect to prior transactions.
In light of these provisions, we believe the regulations would be sustainable to the extent they viewed the sale of a general partnership interest as presumptively a change in ownership under the act and/or an event which could affect the financial ability of a partnership to finance an ECRA cleanup. A sale of the interest of a general partner who has equal management rights in a partnership could be analogous to a sale of a controlling interest in a corporation, or the sale of a minority interest by a person with the power to manage or control the *236 corporation, transactions which trigger ECRA under the statute and other sections of the regulations. Certainly, the sale of such an interest could legitimately trigger concern that the withdrawal of a partner, particularly a "money partner," might leave a partnership unable to fund an ECRA cleanup "down the road" because, while the partner would remain liable for liabilities incurred while that person was a partner, that person (or their personal assets) might not be available at cleanup time, should the partnership property be insufficient to finance a cleanup. Also, one could question how to determine what portion of the costs of ECRA compliance would be attributable to this period. This concern also arises in the context of a limited partnership where the general partner, although having a minimal percentage interest in the partnership, is the partner with unlimited liability.
For these reasons, we are unpersuaded by appellants' argument that ECRA should be triggered only where the industrial establishment itself is sold: this approach would permit a money partner to withdraw, and allow the business to be sold later, when the partner's assets may or may not be available for a cleanup. This approach is also inconsistent with the thrust of the statutory definition of "closing, terminating or transferring operations" which includes as triggers corporate events such as financial reorganization, or insolvency proceedings which do not directly affect the operations of the industrial establishment itself. However, the regulation as it stands, especially without permitting recourse to N.J.A.C. 7:26B-1.9, appears arbitrary and unreasonable.
For example, there could be situations where, upon the withdrawal of a general partner, a succeeding partner agrees to assume all the former's obligations, N.J.S.A. 42:1-36(3). Assuming a succeeding partner is financially worthy, a sale in this instance would not seem to present a concern that funds might not be available for an ECRA cleanup in the future. There seems no reason why a partnership should not be able to demonstrate this, where a corporation may, for example, demonstrate *237 that a sale of a controlling interest in the entity, or a controlling share of its assets, does not trigger ECRA. N.J.A.C. 7:26B-1.5(b)2 and 3.
Further, as DEP itself acknowledges, a partnership agreement may alter the presumption that each partner shares equally in the management of a partnership, and in its profit and losses. See introductory sentence to N.J.S.A. 42:1-18 stating that rights and duties of partners set forth in the section are "subject to any agreement" among the partners. If a general partner has relinquished management rights and has only a small profit interest, his sale of the partnership interest would not seem to necessarily represent a "change of ownership" which has any more significance than the sale of a minority stockholder's interest in a corporation. Similarly, it does not necessarily seem that a partner's ownership rights in an industrial establishment are such that the sale of a partner's entire interest in a partnership mandates application of ECRA. Property contributed to a partnership or acquired with partnership money is partnership property, N.J.S.A. 42:1-8. While a partner is a co-owner of partnership property, N.J.S.A. 42:1-25, the partner only has a right to possess partnership property for partnership purposes. N.J.S.A. 42:1-25(2)a. A partner may not assign the right in specific partnership property except in connection with the assignment of the rights of all the partners in the same property. N.J.S.A. 42:1-25(2)b. When a partner sells the entire partnership interest, that partner conveys the rights in specific partnership property, the interest in partnership profits, and the rights to participate in management. Bromberg & Rabstein, § 3.05 at 3:52. Thus, while DEP emphasizes that all partners are co-owners of partnership property, and a transfer of a partner's interest is thus a "change in ownership" under the Act, it seems to interpret the partnership statute too literally. This is not as if the industrial establishment is being transferred piece-by-piece by the sale of a partnership interest.
*238 This is not a situation where an administrative agency is presumed to possess a factual record to support its regulation. Cf. Elizabeth v. DEP, 198 N.J. Super. 41, 47, 486 A.2d 356 (App.Div. 1984). Rather, DEP makes certain assumptions about the legal status of partnerships to justify the absolute nature of its regulation when, by the express terms of the Uniform Partnership Law, those assumptions do not always pertain. We hold that this section of the regulation is invalid because DEP does not demonstrate why the legislative policies underlying ECRA require that the statute should always be triggered by the sale of a partnership interest, an event which is not specifically included as a statutory trigger. The rationale for the regulation is further drawn in question by the fact that other parts of the regulation allow a corporation to demonstrate that certain events, described by statute as ECRA triggers, should not in particular circumstances be viewed as such.

IX

Changes in SIC Number Triggers
Appellants attack the second paragraph of N.J.A.C. 7:26B-1.3's definition of "closing, terminating, or transferring operations" which includes within that phrase "any changes in operations sufficient to change the primary SIC[5] number of an industrial establishment from a number which is subject to the Act to one that is not subject to the Act. They argue that there is no support for interpreting the plain statutory phrase "closing, terminating or transferring" operations in this manner, and contend that there is no environmental need to so interpret the statute because DEP has other remedial powers to cleanup pollution on sites not covered by ECRA.
*239 In our view, DEP's response to this argument prevails. DEP explains that if there is a change in manufacturing operations sufficient to trigger a change in SIC number pursuant to the regulation, there has been a cessation of the activity which caused a facility to be considered an industrial establishment in the first place. Thus, as DEP convincingly argues, there has in effect been a closing or termination of operations which is analogous to the closing or termination which the Legislature had in mind when it imposed preconditions on closing, terminations, or sales of industrial establishments. Perhaps too suspiciously, DEP notes that a corporation could plan an "escape" from ECRA by first changing manufacturing operations, and then ceasing operations altogether. Since the facility would no longer be an industrial establishment after the change in SIC number, operations could be terminated at a particular location, absent this regulation, without any cleanup of any hazardous substances which might remain from the period when the location was an industrial establishment. While this scenario might be a rare one, we think it is reasonable to trigger the statute when there is a cessation of the operations which brought a facility within the ambit of the Act in the first place; the regulation treats this change in operations as the functional equivalent of a closing or termination. This is not a situation where an agency, under the guise of interpreting a statute, attempts to add something which is not there. See Smith v. Director, Div. of Taxation, 108 N.J. 19, 26, 527 A.2d 843 (1987), citing Kingsley v. Hawthorne Fabrics, Inc., 41 N.J. 521, 582, 197 A.2d 673 (1964), articulating this rule.
We are also unpersuaded by appellants' argument that it is not necessary to adopt the instant provision because DEP has authority under the Spill Act to order a clean-up of a discharge of a hazardous substance, independent of ECRA. Spill Act proceedings can always be commenced in the absence of a sale or transfer which triggers ECRA. Superior Air Prod. v. NL Industries, 216 N.J. Super. 46, 64, 522 A.2d 1025 (App.Div. 1987). But ECRA was enacted precisely to avoid the delays *240 attributable to Spill Act enforcement, delays which were engendered by the fact that, while the Spill Act imposes strict liability on anyone responsible for the discharge of a hazardous substance, prior and successive landowners could litigate for years over responsibility for a discharge. Id. at 61-62, 522 A.2d 1025. Thus, we conclude it irrelevant that the Spill Act might be an alternative to ECRA in the case of an establishment which switches from one type of operation to another. This is always the case in the absence of an ECRA-trigger or where an establishment does not engage in the type of manufacturing which would subject it to ECRA. The availability of the Spill Act does not obviate the need to analyze and decide whether a change in an industrial establishment's SIC number from a number included in the act to one which is excluded, is equivalent to the closing of a facility.
We specifically note that the regulation requires "changes in operations" sufficient to change the SIC number "to an excluded number." A change in classification by the federal government without a change in operations would not in itself be an ECRA trigger under these regulations.

X

Regulation Defining "Sale of Controlling Share of Assets"
The next issue is whether the regulatory definition of "sale of controlling share of assets" is beyond the ambit of ECRA and invalid. N.J.S.A. 13:1K-8b states that "closing, terminating or transferring operations" includes a "sale of the controlling share of the assets" of an industrial establishment. DEP and appellants agree that this last-quoted phrase is unique to ECRA. DEP's regulations further define the phrase as follows:
"Sale or transfer of the controlling share of the assets" means a transfer or sale not in the ordinary course of business, within any five year period since December 31, 1983 by an owner or operator of the industrial establishment, of more than 50 percent of the fair market value during the period of their respective ownership, of the assets of the industrial establishment excluding *241 real property. The term does not include the sale or transfer of equipment or machinery in order to replace, modify, or retool existing equipment or machinery. [N.J.A.C. 7:26B-1.3].
Appellants' basic objection to the regulation is that the Legislature intended, in enacting ECRA, to trigger the statute only when there was a sale of "all or substantially all" of the assets of an industrial establishment not in the ordinary course of business. They argue that the 50% threshold might never be triggered, because the sale of an asset would result in receipt of cash equal to its fair market value, so that the assets of a corporation would in fact never be reduced. They further contend that the unique ECRA statutory phrase should be interpreted in a manner consistent with standard business practice and, according to appellants, most sales of business assets other than in the ordinary course of business involve a transfer of "all or substantially all" assets to the buyer. Finally, appellants quarrel with DEP's exclusion of real property from its 50% test, maintaining that this distinction between real and personal property is without basis.
DEP's response is three-pronged: first, it argues that "controlling share of the assets" simply cannot be transmuted into "all or substantially all" of a business' assets and that if the Legislature had intended to include the latter phrase it would have done so. Second, DEP contends that, contrary to appellants' assertion, proceeds from the corporate sale of assets can easily become unavailable to a corporation which may have ECRA responsibilities and thus disputes appellants' argument that the 50% threshold would never be triggered. Finally, DEP points out that the regulation is not inconsistent with general business law: DEP notes that the Bulk Sales Transfer Act applies to sales of 50% or more of a business' assets, and not "all or substantially all" of its assets. We find DEP's contentions more persuasive on this point.
Self-evidently, "controlling share of the assets," by its plain terms, means something other than "substantially all" assets. The interpretation which first and most logically comes to mind *242 is that "controlling share" means "more than 50%", although the argument could certainly be made that in some situations less than 50% would be a controlling share. As DEP observes, there is no legislative history which explains this phrase, and the agency's interpretation of it is entitled to some deference. In the Matter of Vulcan Materials Co., 225 N.J. Super. 212, 221, 542 A.2d 25 (App.Div. 1988) (DEP's interpretation of ECRA is entitled to deference).
Further, DEP's interpretation is consistent with the Uniform Commercial Code, Bulk Transfers, N.J.S.A. 12A:6-101 to -111, which Code appellants also refer to as an appropriate model. Indeed, DEP's explicit reference to the UCC in its responses to comments demonstrates that DEP's development of this regulation was a reasoned one which attempted to model this ECRA provision on existing business law. As DEP noted in those comments, the Bulk Transfers Act attempts to address a problem similar to that presented by a sale of assets by a business subject to ECRA  it protects creditors of a merchant who sells out his stock in trade to anyone for any price, leaving his creditors unpaid. The Bulk Transfers provision is triggered by a sale of a "major part" of the materials, supplies, merchandise or other inventory of a business subject to the act, or a "substantial part" of the equipment of such enterprises. N.J.S.A. 12A:6-102. The New Jersey Study Comment to this section of the UCC, reproduced following N.J.S.A. 12A:6-102, makes clear that this provision was modeled after the statutes of several other states, where the phrase "major part" had been interpreted to mean "more than 50%".
Given the uniqueness of the phrase "controlling share of the assets" and the absence of any legislative history illuminating its meaning, DEP acted reasonably in drawing on the Bulk Sales Act in drafting its definition. Further, we observe that a business is permitted to demonstrate that ECRA is not appropriately triggered and is inapplicable even if it would be deemed, by a literal reading of the regulations, to have sold a controlling share of its assets. N.J.A.C. 7:26B-1.5(6)(3) incorporating *243 N.J.A.C. 7:26B-1.9. Thus, any imprecision in the regulations is mitigated.
In addition, appellants' argument that the 50% threshold would never be reached, because a sale of assets for fair market value replenishes those assets from an accounting standpoint, is disingenuous and incorrect. We query why appellants would be concerned about a regulation which they contend would never "capture" any sale of assets. In any case, DEP's concern that the proceeds from the sale of a controlling share of assets might not be available for ECRA compliance seems eminently reasonable to us. Those proceeds could go to pay creditors or become otherwise obligated or dissipated.
Finally, the legislation, N.J.S.A. 13:1K-8(b), gives no hint as to whether the term "assets" includes real property, but DEP's decision to exclude such property is also consistent with the Bulk Sales Act, N.J.S.A. 12A:6-102, and seems a reasonable construction of the phrase "controlling share of the assets." The language was apparently intended to encompass something other than the outright transfer of the property which formed part of the industrial establishment, which would be otherwise subject to ECRA. N.J.S.A. 13:1K-11.

XI

ECRA as "Site Specific"
Appellants next claim that DEP's definition of "cleanup plan" is inconsistent with ECRA. Appellants contend that ECRA obligates an owner of an industrial establishment to clean up the site of the business operations only, and that ECRA has no application to discharges on the site which flow off-site. The disputed regulation, N.J.A.C. 7:26B-1.3, defines a cleanup plan as "... a plan for the cleanup of an industrial establishment and any contamination which has emanated or is emanating from the industrial establishment, approved by the Department...." DEP contends that this regulation is consistent with a common sense approach to the statute, which recognizes that pollution does not defer to property boundaries. *244 DEP also contends that the statute itself provides support for requiring the cleanup of discharges on-site which flow off-site.
N.J.S.A. 13:1K-8 specifies that a cleanup plan is a plan approved by the Department which may include a description of "[h]azardous substances and wastes that will remain on the premises; a description of the types and locations of storage vessels, surface impoundments, or secured landfills containing hazardous substances and wastes; [and] recommendations regarding the most practicable method of cleanup...." "Negative declaration" is defined as a statement, approved by the department, "that there has been no discharge of hazardous substances or wastes on the site, or that any such discharge has been cleaned up in accordance with procedures approved by the department, and there remain no hazardous substances or wastes at the site of the industrial establishment." [Emphasis added].
Both of these statutory provisions, by their express language, focus on the condition of the industrial site itself, not discharges off-site. One could reasonably argue that the purpose of ECRA is undermined if owners are allowed to transfer sites without cleaning up discharges which have flowed onto areas surrounding the site. However, when a statute speaks plainly, courts will enforce it as written. In the Matter of Vulcan Materials Co., supra, 225 N.J. Super. at 221, 542 A.2d 25. While ECRA is a remedial statute which is arguably liberally or generously construed, In Re Robert Mitchell Center, supra, 223 N.J. Super. at 173, 538 A.2d 410, the courts, in interpreting other remedial environmental statutes, have carefully construed statutory language which imposes liability on a landowner: see, e.g., Atlantic City Mun. Util. Auth. v. Hunt, 210 N.J. Super. 76, 96, 509 A.2d 225 (App.Div. 1986) (effects of a discharge which occurred before the effective date of the Spill Act do not trigger the Act); Summit Assoc. v. Liberty Mut. Fire Ins., 229 N.J. Super. 56, 65, 550 A.2d 1235 (App.Div. 1988) (prior to 1984, discharge had to threaten waters of state to *245 trigger Spill Act; discharge which threatened natural resources not subject to the act); and DEP v. Arky's Auto Sales, 224 N.J. Super. 200, 207, 539 A.2d 1280 (App.Div. 1988), and DEP v. J.T. Baker Co., 234 N.J. Super. 234, 240-241, 560 A.2d 739 (Ch.Div. 1989) (Spill Act's statutory definition of discharge does not include migration of hazardous substances already present in soil or ground waters). Whatever the policy reasons in support of requiring the owner of an industrial establishment to clean up contamination on and off the site before transferring the property, the statute speaks exclusively in terms of hazardous substances remaining on the site.
Thus, we find very problematic the portion of the regulation requiring the cleanup of any contamination "which has emanated ... from" the site. To the extent that it is read to require a property owner to clean up contamination which has spread to property owned by another as a pre-condition of transferring an industrial establishment, the regulation goes beyond the express terms of the statute. In this sense, it is analogous to the regulation invalidated in Matter of Freshwater Wetlands Rules, supra, 238 N.J. Super. at 530, 570 A.2d 435, which had limited in time an express statutory exemption, without a time limit, from an environmental statute. See also New Jersey Chapter of NAIOP v. DEP, 241 N.J. Super. 145, 158-159, 574 A.2d 514 (App.Div.), certif. denied, 122 N.J. 374, 585 A.2d 379 (1990) (wetlands regulation held site specific).
While a property owner can be compelled under the Spill Act to remedy any discharge onto land which threatens the natural resources of the State, Summit Assoc. v. Liberty Mut. Fire Ins., supra, 229 N.J. Super. at 65, 550 A.2d 1235, it does not follow that one can be compelled to do so as a condition of the sale of an industrial establishment. ECRA is directed to the site of the industrial establishment. The Spill Act is not.
For these reasons, we find that portion of N.J.A.C. 7:26B-1.3, which requires that a cleanup plan include procedures for remedying contamination from the industrial establishment *246 which exists off-site, on properties not owned by the operator of the establishment, beyond the scope of the enabling legislation and invalid. We find no evidence from the language of ECRA or in the meager legislative history available of any intent to impose cleanup obligations under the Act on off-site pollution. See "Senate Energy and Environment Committee Statement" Assembly, No. 1231, L. 1983, c. 330 at N.J.S.A. 13:1K-6. This may be accomplished under other remedial environmental statutes, including the Spill Act.

XII

Regulations on Condemnations as "Triggers"
Appellants next challenge DEP's regulation requiring ECRA compliance in the case of partial condemnations of industrial establishments. The ECRA statute and regulations provide that the Act is applicable any time there is a "conveyance of the real property" of an industrial establishment, or when an industrial establishment otherwise undergoes change in ownership, including a change in ownership resulting from condemnation. N.J.S.A. 13:1K-8b; N.J.A.C. 7:26B-1.5(b)8. However, N.J.A.C. 7:26B-13.1 provides that ECRA does not apply when the parcel to be conveyed has never been involved with hazardous substances or wastes and the sales price of the real property to be conveyed, together with the diminution in value to the remaining property, is not more than 20% of the total appraised value of the real property of the industrial establishment. N.J.A.C. 7:26B-13.1.
The 20% figure was apparently suggested by industry representatives. DEP accepted their suggestion that there be a limited conveyance exception to ECRA and adopted the cut-off figure which they proposed. According to DEP, if these criteria are not met, a conveyance of part of the real property of an industrial establishment will require an ECRA review of the entire site. Through cross-reference, the provisions governing *247 limited conveyances are made applicable to partial condemnations. N.J.A.C. 7:26B-1.5(b)8.
While the industry appellants do not attack the limited conveyance rule as such, they challenge its applicability to partial condemnations. They also seem to argue, quite apart from the partial condemnation issue, that condemnations should not be viewed as a change in ownership under the Act.
As to the latter point, DEP's regulation applying ECRA to condemnations, partial or otherwise, is eminently reasonable. The Act applies to a change in ownership, N.J.S.A. 13:1K-8b, and condemnation does work a change in ownership. The concern that hazardous substances be cleaned up when an industrial establishment ceases operations is just as strong when the transferee is a public body and, indeed, is perhaps more compelling than when an industrial establishment is transferred to a private entity, since the latter might have greater resources to correct environmental problems. We conclude that it is not inequitable or in violation of the property owner's right to just compensation to require clean-up of condemned land; it would be inequitable to permit a landowner to avoid ECRA compliance by the fortuitous event of condemnation.
Appellants next contend that it is unreasonable and beyond the scope of the statute to require ECRA compliance when there is only a partial condemnation and an industrial establishment continues to operate on the site. Industrial appellants underscore the unreasonableness of requiring review of an entire ECRA site when only a portion thereof is condemned. At the other end of the spectrum, environmental appellants argue that any conveyance, however minor, should trigger ECRA.
In our view, DEP's decision to require review of an entire site when real property comprising more than 20% of the total value of the industrial property is conveyed is in accord with the purpose of ECRA and a reasonable exercise of its discretion to issue regulations implementing broad statutory language. *248 Turning to industry appellants' arguments first, they focus on the fact that N.J.S.A. 13:1K-8b defines "closing, termination, or transferring" as the cessation of all operations and a "change in ownership ... including ... the conveyance of the real property." They argue that, reading these two clauses together, ECRA applies only to the conveyance of "all" real property of an industrial establishment. In our view, the word "all" does not apply to the transfer of property but to the termination of industrial operations. The transfer of real property is a separate ECRA trigger, independent of a cessation of operations.
Environmental appellants make a similar linguistic argument, which also depends on a parsing of N.J.S.A. 13:1K-8b. They reason that because that provision triggers ECRA upon "any other transaction or proceeding through which an industrial establishment ... undergoes change in ownership ... including but not limited to ... the conveyance of the real property" [emphasis added], that ECRA applies to any conveyance of the real property of an industrial establishment. Again, in our view, the "any" modifies "transaction or proceeding" and the transaction or proceeding which is at issue here is "the conveyance of the real property" of the industrial establishment. As both sets of appellants implicitly acknowledge, the statute does not say in so many words either that ECRA applies to transfers of real property only when the entire site is transferred or that it applies to any transfer of real property, no matter how much of the industrial establishment does not change ownership. We are not persuaded by the grammatical or linguistic arguments made by either industry or environmental appellants.
The problem of partial conveyances is one which DEP thought it had to address in order to further the legislative purpose of preventing the abandonment of industrial sites. See, Schmidt, supra, 38 Rutgers L.Rev. at 749-750, explaining that DEP officials allegedly decided to apply ECRA to some partial conveyances in order to prevent a "cookie cutter" approach, whereby industrial establishments could be sold piece-meal, *249 avoiding ECRA until the final transfer. See also GATX Terminal Corp., supra, 173 N.J. Super. at 537, 414 A.2d 980 (declarations of legislative policy can serve as authorizations for regulations implementing that policy). The decision to apply ECRA to some partial conveyances is also analogous to the regulation, sustained in Fabritex Mills, supra, which applied ECRA to the cessation of "substantially all" as opposed to "all" operations. 231 N.J. Super. at 229, 555 A.2d 649. In Fabritex, we reasoned that statutory language must be construed sensibly to achieve the legislative purpose, and that a company should not be able to evade the statute by leaving some substances stored on-site indefinitely. Similar logic augurs against allowing a company to avoid ECRA compliance through piecemeal sales.
Conversely, the regulatory decision to exclude some partial conveyances from the scope of the statute is also in accord with Fabritex's admonition that a statute should not be construed so literally as to defeat its purpose, so that a discontinuance of one line of operations would trigger ECRA, even though the industrial establishment continues in substantially the same manner as previously. Id. at 230, 555 A.2d 649. If a small portion of an industrial establishment is conveyed (relative to its total value), and was never involved in the production of hazardous materials, there is nothing in the philosophical purpose of the statute or its text which mandates that an owner should follow ECRA procedures.

XIII

Regulation Defining "Industrial Establishment"
The next challenge is to DEP's definition of "industrial establishment." ECRA itself defines an "industrial establishment" as "... any place of business engaged in operations which involve the generation, manufacture, refining, transportation, treatment, storage, handling, or disposal of hazardous *250 substances or wastes on-site, above or below ground...." N.J.S.A. 13:1K-8f. The regulations define the same term as "any place of business or real property at which such business [involving hazardous substances] is conducted ... the industrial establishment includes all of the block(s) and lot(s) upon which the business is conducted and those contiguous block(s) and lot(s) controlled by the same owner or operator that are vacant land, or that are used in conjunction with such business." N.J.A.C. 7:26B-1.3.
Industry appellants contend that the statute does not refer to "lots or blocks" on which a business is conducted, and appear to argue that the statute covers only the area on which the business is actually operated, excluding those areas on the same "lot" which are not used for the business. Appellants also argue that there is no authority for DEP to include contiguous vacant land as part of an industrial establishment.
DEP first points out that, in response to industry concerns, it modified the prior regulations, which had included as part of an industrial establishment all contiguous block(s) or lot(s) controlled vacant or used for a completely different business purpose. DEP argues that the regulation, as revised, should be sustained, and emphasizes that it is based on a determination that such areas are likely to be contaminated by the products of an industrial establishment.
Appellants' contention that an industrial establishment includes only the productive or plant portion of a business operation is indeed a far-fetched interpretation of the statute. The Legislature obviously was concerned with the cleanup of sites contaminated by hazardous substances, N.J.S.A. 13:1K-7. It strains credulity to imagine that the Legislature believed only the ground occupied by a physical structure would be threatened by such contamination. At a minimum, the term "industrial establishment" must include the lot, as defined for tax or deed purposes, on which a plant or facility is located. We also *251 conclude that it can fairly be construed to include contiguous parcels used in conjunction with the business, as well as contiguous parcels of vacant land controlled by the owner or operator of the enterprise.
Appellants themselves note that the term "industrial establishment" is borrowed from the SIC manual which ECRA references. N.J.S.A. 13:1K-8f. The phrase implies a broader unit or entity than a single plant, a fact which is borne out by appellants' citation in their brief of the SIC definition of "industrial establishment" as "an economic unit, generally at a single physical location, where business is conducted or services or industrial devices [sic] are performed." Thus, under this definition, regardless of the boundaries of a tax map, contiguous parcels used in conjunction with an industrial establishment would be a part of the establishment. We agree with DEP's position: common sense tells us these sites are likely to be threatened by contamination.
The same reasoning applies to contiguous vacant parcels. DEP's experience, derived from administering the Act, is that such parcels are likely to be contaminated and that a case-by-case review of instances of vacant parcels is not warranted. This rationale forms a reasonable basis for the rule. See Elizabeth v. State Dept. of Envtl. Protect., supra, 198 N.J. Super. at 47-48, 486 A.2d 356 (extensive and detailed economic data before agency was presumed to have been translated, in exercise of administrative expertise, into waste flow order; order itself not deficient because it failed to include detailed economic analysis). Moreover, even without its experience in administering the Act, DEP's judgment that contiguous vacant parcels should be included in the Act is one which furthers the Legislature's aim of effecting an orderly cleanup of industrial sites, and is consistent with the sense that the term "industrial establishment" includes more than just the core production facilities of a business but encompasses as well such areas as parking lots and buffer zones.

*252 XIV

The Commerce Clause Challenge
Next we treat the federal Commerce Clause challenge. Industry appellants contend that the applicability provisions of DEP's ECRA regulations violate the Commerce Clause because they directly and significantly burden interstate and international commerce. Their attack seems to be directed to the parent-subsidiary issue discussed in III. Their examples of the impermissible burden placed on interstate transactions describe corporate transactions in which a corporation in another state (or country) has a subsidiary or operation in New Jersey which functions as an "industrial establishment." Appellants reason that because ECRA is triggered by such transactions, and DEP has the power to void a transaction for failure to comply with the statute, the regulations unconstitutionally burden interstate (or international) commerce. DEP responds that under governing Commerce Clause standards, the ECRA regulations are valid. We agree with DEP.
A state law which is motivated by economic protectionism and which directly and intentionally burdens interstate commerce will almost certainly be held invalid. Philadelphia v. New Jersey, 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475, 481 (1978). But much more latitude is afforded a state law which advances legitimate state interests. Id., 437 U.S. at 624, 98 S.Ct. at 2535, 57 L.Ed.2d at 481-482. Thus, in Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174, 178 (1970), the United States Supreme Court stated:
Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.... If a legitimate local purpose is found, then the question becomes one of degree.
We conclude beyond cavil that ECRA furthers a legitimate local interest because it is directed to facilitating the cleanup of hazardous substances in New Jersey. Environmental and public *253 health concerns, when not expressly preempted by federal law, are legitimate, indeed compelling, state concerns. Glassboro v. Gloucester County, 199 N.J. Super. 91, 98-99, 488 A.2d 562 (App.Div.), aff'd, 100 N.J. 134, 142-147, 495 A.2d 49 (1985). ECRA makes no effort to impede the flow of out-of-state articles of commerce into the state, the type of activity which is typically subject to a Commerce Clause challenge. Cf. Philadelphia v. New Jersey, supra, 437 U.S. at 628-629, 98 S.Ct. at 2537-2538, 57 L.Ed.2d at 484-485 (New Jersey statute prohibiting transport into state of waste generated elsewhere violated Commerce Clause). Nor, in our view, does it directly and sweepingly burden interstate transactions, as did the Illinois law regulating corporate takeovers declared invalid in Edgar v. Mite Corp., 457 U.S. 624, 642-643, 102 S.Ct. 2629, 2640-2641, 73 L.Ed.2d 269, 283-284 (1982). The Edgar Court focused on the fact that the law applied to tender offers involving any corporation incorporated in Illinois or which had 10% of its stated capital or paid-in surplus represented in Illinois. Ibid. The Court pointed out that the law could affect transactions in which there were no Illinois shareholders and the transactions were conducted completely outside the state of Illinois. Ibid. The Court was also unpersuaded that the statute had any beneficial effects for corporate shareholders, in Illinois or elsewhere, which were not also furthered by federal legislation. Id. at 643-645, 102 S.Ct. at 2641-2642, 73 L.Ed.2d at 284-285.
There is no conflict with or preemption by federal statutes or environmental regulations. The challenged regulations affect interstate transactions only when those transactions could putatively impact on the cleanup of hazardous substances in New Jersey. The regulations also provide an exception mechanism by which a corporation can attempt to rebut the presumed effect of a transaction by a parent corporation on a subsidiary which owns an industrial establishment in New Jersey. N.J.A.C. 7:26B-1.9. ECRA provisions do not duplicate or conflict with federal legislation. The regulations do not attempt to either directly regulate interstate commerce or indirectly impose *254 a burden which outweighs the local interests which they further. See In re Waste Disposal Agreement, 237 N.J. Super. 516, 529-531, 568 A.2d 547 (App.Div. 1990); see also Midlantic National Bank v. New Jersey DEP, 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986) (DEP regulatory order upheld; right to protect public health and safety by DEP prevailed over Supremacy Clause and preemption challenges).

XV

Regulations Exempting Intrafamily Transfers
Finally, we consider the exemption for intrafamily transfers. N.J.A.C. 7:26B-1.8(a) 20, 21 and 22 exempt from ECRA transfers of an industrial establishment by devise or intestate transfer, transfers of an industrial establishment between members of the same family (parents, children, grandparents, grandchildren, siblings and spouses), and transfers to a beneficiary pursuant to the terms of a trust, where the settlor and beneficiary are identical or members of the same family. The last qualification is found in N.J.A.C. 7:26B-1.5(b)16.
Environmental appellants contend that the statute provides no authorization for such an exemption. They maintain that intrafamily transfers present the same potential for evading the Act as many of the transactions which DEP has included within the scope of the statute. In this appeal and in its response to similar comments during the rulemaking proceeding, DEP acknowledged that there is no specific statutory authorization for such an exemption. DEP insists that it has the implied authority to grant exemptions which would further the purpose of the Act. In support of its authority to adopt this regulation it also cites N.J.S.A. 13:1K-8f, which authorizes it to exempt certain groups or classes of operations within the SIC major group numbers which fall within the Act, upon a finding that the operation of the industrial establishment does not pose a risk to public health or safety. Ultimately, DEP invokes its experience in administering the Act.
*255 We conclude that this regulatory exemption presses the limits of DEP's authority and that, in a sense, DEP is trying to have it both ways on this appeal. On one hand, it reads the statute expansively in including varied business transactions within the Act because of its concern that many devices may be employed to circumvent regulation but on the other hand, in this regulation, it decides that exempting intrafamily transfers furthers the purpose of the Act, without justifying this position very strongly. N.J.S.A. 13:1K-8f clearly does not provide authority for this exemption, since the exemptions it permits are based on the nature of the industrial establishment, rather than on the identity of the owners.
DEP does suggest that ECRA is intended to apply to business transactions, as shown by the business nature of the transactions described in the statutory definition, i.e., "closing, terminating, or transferring" operations. There is perhaps some merit to this position; one can also rationally urge that an intra-family transfer might be much more likely to qualify for a deferral of the obligation to implement a cleanup plan under N.J.S.A. 13:1K-11, since a family transferee is more likely to continue the previous use of the property. On balance, we defer to the agency and sustain the regulation based on DEP's presumed experience that intra-family transfers do not need to be regulated by ECRA, recognizing that perhaps the heavy chore of policing such transfers by an overburdened agency most likely severely outweighs any potential environmental benefit.

CONCLUSION
The regulations reviewed in VII, VIII and XI are invalidated. The matter is remanded to the agency for formulation and promulgation of standards for nonapplicability determinations under N.J.A.C. 7:26B-1.9 within 90 days. See N.J.S.A. 52:14B-4. Formulation of reasonable standards will overcome the challenges discussed in III, IV, V, VI and X, which regulations *256 are approved conditionally, subject to compliance on the remand.
Affirmed in part; reversed in part, remanded in part without retention of jurisdiction.
NOTES
[1] One commentator has noted that DEP, by virtue of this language, has been given a "vague mandate" to regulate changes in ownership, and that this directive, coupled with the broad environmental purposes of the Act, has led DEP to assert jurisdiction of ECRA to transactions well beyond the examples contained in the Act. See Schmidt, "New Jersey's Experience Implementing The Environmental Cleanup Responsibility Act," 38 Rutgers L.Rev. 729, 745-746 (1986). The author offers as an illustration of this policy the practice of finding that transactions at the parent corporation level are ECRA triggers. While not expressly faulting DEP for this policy, the author suggests that the statute should be revised to include more precise transactional triggers.
[2] N.J.A.C. 7:26B-10.1 states:

De minimis quantity exemption
(a) The owner or operator of an industrial establishment who is granted a de minimis quantity exemption from the Department shall be exempt from the provisions of the Act and this chapter except as provided at N.J.A.C. 7:26B-1.10 based on de minimis quantities of hazardous substances stored or handled at the industrial establishment.
(b) The de minimis quantity exemption shall be granted by the Department subject to (e) below only if (c) and (d) below and all of the following criteria of this subsection are met:
1. In the case of a mixture of hazardous substances stored or handled at the industrial establishment:
i. The total quantity of hazardous substances stored or handled at any one time is not in excess of one percent of the mixture, with the total quantity of hazardous substances not in excess of 500 pounds;
ii. Any mixture containing hazardous substances is present in the same form and concentration as a product packaged for distribution or use by the general public and this mixture is used by the industrial establishment in a manner similar to that of the general public;
iii. Any mixture containing hazardous substances is used solely in routine office operations; or
iv. Any mixture containing hazardous substances is in final product form for wholesale or retail distribution.
2. Any paints and varnishes containing hazardous substances are used for buildings and grounds maintenance purposes only and are not used as part of the business operations except as provided below at 3;
3. The quantity of paints, inks (except those actually used or to be used in office copying equipment[)], adhesives and varnishes containing hazardous substances that are used annually in the business operations of the industrial establishment amount to five gallons or less;
4. The quantity of lubricating and hydraulic oils used for maintenance purposes shall not be more than 55 gallons per year, and the total quantity present at the industrial establishment shall not be more than 110 gallons at any one time;
5. The quantity of petroleum products, other than lubricating and hydraulic oils, stored at the industrial establishment at any one time shall not be more than 11 gallons; and
6. Pesticides are present in the same form and concentration as packaged for distribution or use by the general public, provided these products are used in accordance with the manufacturer's instructions for pesticide application and are not designed as "prohibited" or "restricted" at N.J.A.C. 7:30 pursuant to the New Jersey Pesticide Control Act of 1971, N.J.S.A. 13:1F-1 et seq.
(c) The de minimis quantity exemption shall be granted only if:
1. The owner or operator of the industrial establishment has been and continues to be the sole and original owner or operator of the industrial establishment from the date of construction of the facility on the property;
2. The most recent prior owner of the real property of the industrial establishment received a negative declaration, a cleanup plan approval, or a de minimis quantity exemption from the Department; or
3. The owner or operator of the industrial establishment has obtained and submitted to the Department an affidavit from his or her transferor that the transferor was the sole and original owner or operator at the industrial establishment from the date of construction of the facility on the property and that the transferor met the criteria set forth in (b) above, for the entire period of ownership or operation by the transferor.
[3] N.J.A.C. 7:50-4.66 states:

7:50-4.66 Standards
(a) An application for a waiver shall be approved only if the applicant satisfies (b) below and an extraordinary hardship or compelling public need is determined to have been established under the following standards:
(1) The particular physical surrounding, shape or topographical conditions of the specific property involved would result in an extraordinary hardship, as distinguished from a mere inconvenience, if the provisions of this Plan are literally enforced. The necessity of acquiring additional land to meet the minimum lot size requirements or management standards of this Plan shall not be considered an extraordinary hardship, unless the applicant can demonstrate that there is no contiguous land which is reasonably available. Any contiguous lands in common ownership at any time on or after January 14, 1981, shall be considered to be reasonably available. An applicant shall be deemed to have established the existence of extraordinary hardship only if he demonstrates, based on specific facts, that the subject property, along with any contiguous lands which are either in common ownership or are reasonably available, does not have any beneficial use if used for its present use or developed as authorized by the provisions of this Plan, and that this inability to have a beneficial use results from unique circumstances peculiar to the subject property which:
i. Do not apply to or affect other property in the immediate vicinity;
ii. Relate to or arise out of the characteristics of the subject property rather than the personal situation of the applicant; and
iii. Are not the result of any action or inaction by the applicant or the owner or his predecessors in title including any transfer of contiguous lands which were in common ownership on or after January 14, 1981.
2. An applicant shall be deemed to have established compelling public need if the applicant demonstrates, based on specific facts, one of the following:
i. The proposed development will serve an essential health or safety need of the municipality or, in the case of an application serving more than one pinelands municipality, the county in which the proposed development is located, that the public health and safety require the requested waiver, that the public benefits from the proposed use are of a character that override the importance of the protection of the pinelands as established in the Pinelands Protection Act or the Federal Act, that the proposed use is required to serve existing needs of the residents of the Pinelands, and that no feasible alternatives exist outside the Pinelands Area to meet the established public need and that no better alternative exist within the Pinelands Area; or
ii. The proposed development constitutes an adaptive reuse of an historic resource designated by the Pinelands Commission pursuant to N.J.A.C. 7:50-6.154 and said reuse is the minimum relief necessary to ensure the integrity and continued protection of the designated historic resource and further that the designated historic resources's integrity and continued protection cannot be maintained without the granting of a Waiver of Strict Compliance.
(b) An application for a waiver shall be approved only if it is determined that the following additional standards also are met:
1. The granting of a waiver will not be materially detrimental or injurious to other property or improvements in the area in which the subject property is located, increase the danger of fire, endanger public safety or result in substantial impairment of the resources of the Pinelands Area;
2. The waiver will not be inconsistent with the purposes, objectives or the general spirit and intent of the Pinelands Protection Act, the Federal Act or this Plan; and
3. The waiver is the minimum relief necessary to: relieve the extraordinary hardship, which may include the granting of a residential development right to other lands in the Protection Area that may be transferred or clustered to those lands in accordance with N.J.A.C. 7:50-5.30, or to satisfy the compelling public need.
[4] See Bromberg & Rabstein, § 3.05 at 3:52 (1988), describing a conveyance of all of a partner's property rights in the firm as his transfer of his rights in specific partnership property, his interest in the partnership and his rights to participate in management. Rabstein & Bromberg observe that such a conveyance in effect involves the withdrawal of a partner or substitution of one partner for another through a transfer of the partner's right to participate in management. Ibid. They distinguish this type of transfer from the other types of transfers which can be made by a partner: (1) a conveyance of the firm's entire interest in an asset; (2) an assignment of a partner's right in specific partnership property; and (3) a conveyance of a partner's interest in a partnership. The latter is defined as a partner's right to profits and surplus and a conveyance thereof does not include the right to participate in the management of the firm. N.J.S.A. 42:1-26 and N.J.S.A. 42:1-27.
[5] As noted at the outset, only businesses with certain Standard Industrial Classification numbers, as set forth in a manual prepared by the federal Office of Management and Budget, are subject to ECRA.