589 A.2d 1046

DEPARTMENT OF COMMUNITY AFFAIRS, DIVISION OF HOUS-ING AND DEVELOPMENT, COMPLAINANT-RESPONDENT, v. ATRIUM PALACE SYNDICATE, RESPONDENT-APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued February 21, 1991—Decided April 29, 1991.

512

Before Judges KING, R.S. COHEN and STERN.

*Bruce H. Snyder* argued the cause for appellant (*Lasser, Hochman, Marcus, Guryan and Kuskin,* attorneys, *Bruce H. Snyder* on the brief).

*Eliaser Chaparro,* Deputy Attorney General, argued the cause for respondent (*Robert J. Del Tufo,* Attorney General, attorney, *Mary C. Jacobson,* Deputy Attorney General, of counsel and *Eliaser Chaparro* on the brief).

*William Pagano* argued the cause for intervenors *Cybul, Linder and Stern.*

*Philip Scalo* argued the cause for intervenors *Dowling & Bokor* (*Smith, Don, Alampi, Scalo & D'Argenio,* attorneys, *Philip Scalo* of counsel and *Frank Terranella* on the brief).

The opinion of the court was delivered by

COHEN, R.S., J.A.D.

This is the second appeal by Atrium Palace Syndicate ("APS") this term from orders of the Department of Community Affairs requiring APS to return deposits to contract buyers of residential condominium units. Once again we affirm the Department's orders.

In our first opinion, *Department of Community Affairs v. Atrium Palace Syndicate,* 244 *N.J.Super.* 329, 582 *A.*2d 821 (App.Div.1990), *certif. denied,* —— *N.J.* —— (1991), we outlined

the statutory framework provided by the Planned Real Estate Development Full Disclosure Act, *N.J.S.A.* 45:22A–21 *et seq.*, and the regulations adopted to implement it, *N.J.A.C.* 5:26–1.1 *et seq.* We also quoted the relevant provisions of the buyers' identical contracts. 244 *N.J.Super.* at 331–332, 582 *A.*2d 821. A summary of the contract terms will suffice for the present opinion.

Closing of title was agreed to take place on or before October 1, 1988, on which date the unit was to be substantially complete, as evidenced by a temporary certificate of occupancy ("TCO") issued by the Building Department of Fort Lee. Closing could be postponed by APS, without liability for damages, for a period up to 180 days. However, if there is no closing within the additional 180 days, the buyer "may elect to terminate ... on not less than ten (10) days written notice," and get the deposit back, with interest. The time for performance by the buyer "is of the essence of" the contract. APS "shall give Purchaser ten (10) days notice of the closing date." [1]

■ In the first cases before us, APS called for time-of-the-essence closings on March 30, 1989, the 180th day of the extension period. APS was not ready to close on March 30, because it did not have TCOs covering the units involved. We held that the contract required substantial completion to be evidenced by the issuance of TCOs; therefore APS breached its contract by being unready to perform at the time of closing which it demanded. In those circumstances the buyers were entitled to return of their deposits, whether or not they were individually ready to perform on March 30. Since the seller was unable to tender performance at the time it chose, it did not matter whether the buyers would have been able to perform if put to the test. In our prior opinion we should have emphasized that APS had called for the March 30 closings on a

---

[1] The last-quoted phrase is a part of Paragraph 15 of the contract which was omitted from our prior opinion.

"time-of-the-essence" basis. Absent that emphasis, our prior opinion could be misread to say that the buyers were entitled to their deposits solely because March 30 came and went without any action on anyone's part.

In the present appeal, six units are involved. The first was under contract to David Cybul. He contracted to buy on May 27, 1987. There were some months of correspondence about his dissatisfaction with the construction of his unit. By March 30, 1989, the last day of the extension period, no closing date had yet been set. Therefore Cybul wrote to APS terminating his contract and demanding return of his deposit within ten days.

We need not decide if the actual effect of Cybul's March 30 letter was to terminate immediately and demand repayment in ten days, or to make time of the essence of APS's performance in ten days. APS cannot now claim confusion over the effect of the March 30 letter or the parties' postures at the crucial times. It is clear that APS could not perform at any time in the months after March 30, and therefore Cybul was entitled to his deposit. Cybul's unsatisfied demands for inspection of the premises under construction and for an interval of time between inspection and closing did not waive his right to demand timely performance by APS.

On May 10, two days after Cybul secured a Superior Court order to show cause why his deposit should not be returned, APS responded with a notice making time of the essence as of May 23. On May 23, there still was no TCO covering the unit. Anyway, APS had already breached the contract and thus excused performance by Cybul.

Another unit was under contract to Myron and Leila Linder. They were represented by the same attorney as Cybul, and their positions were the same in all essential respects. They too were entitled to a return of their deposit.

Another unit was sold to Arthur and Alice Stern. APS sent them a January 26 letter scheduling a time-of-the-es-

sence closing for April 21. The Sterns wrote to APS on March 31, electing to terminate as of the close of business on April 10, and demanding return of the deposit. APS could not perform on April 10, for lack of a TCO, and the Sterns were therefore entitled to a return of their deposit. The closings APS subsequently scheduled had no effect at all, as APS was already in breach.

 APS points out, however, that on March 31 the Fort Lee Construction Official issued a TCO for the Stern unit. That is so. Apparently identical TCOs for 17 units were issued that day. In the printed form of each, however, was typewritten the following condition, to be satisfied by June 1:

> Subject to the installation of all kitchen appliances, handles and fixtures, operable prior to any physical occupancy.

APS's contractual duty was to deliver a unit which was substantially complete, as evidenced by a TCO. APS could not require a closing before the issuance of a TCO. *N.J.A.C.* 5:26–6.5(a)2. Occupancy of a unit without a TCO is prohibited by *N.J.A.C.* 5:23–2.23(a).

The Uniform Construction Code authorizes issuance of a TCO for part of an unfinished structure "if the part or parts of the building or structure to be covered by the certificate may be occupied ... without endangering the health and safety of the occupants or users." *N.J.S.A.* 52:27D–133. *N.J.A.C.* 5:23–2.-23(h) interprets the Code as follows:

> No [TCO] shall be granted until all required utilities, including but not limited to water, sewer, electric and gas are installed and in service.

 Clearly a unit without "kitchen appliances, handles and fixtures" is neither substantially complete nor occupiable within the contemplation of the Uniform Construction Code. For that reason, the Construction Official conditioned the TCO on completing the kitchen "prior to any physical occupancy." A certificate of occupancy that bars occupancy is not a certificate of occupancy. It is a mystery what purpose the Construction Official had in mind when he issued it. It is apparent what

purpose APS had in obtaining it. For these cases, however, a non-occupancy TCO is a nullity.

■ Another contract purchaser was Rose Bokor. She received a January 26 letter setting a closing for May 4. Apparently after she protested the attenuated time schedule, she received a March 3 letter setting a closing for March 31 and making time of the essence. On that day APS had a non-occupancy TCO for the Bokor unit just like the one issued for the Sterns' unit. It was a nullity for the same reasons. On March 31, Bokor terminated, as she had the right to do. She certainly had no duty to afford APS additional time to perform after it had failed to do so at a time-of-the-essence closing demanded by APS.

Mr. & Mrs. James Dowling contracted to buy another unit. On January 26, APS scheduled a time-of-the-essence closing for April 24. The Dowlings wanted to close on April 27, which was agreeable to APS, but also wanted an absolute deadline of May 31, which APS would not accept. APS thus set a closing for March 31; it was itself unable to perform; it had only a non-occupancy TCO. The Dowlings then terminated, as they had the right to do.

The last of the units involved in this appeal was sold to Murray Appleman. His situation almost exactly paralleled the Dowlings' and he stands in the same position.

■ We conclude that the termination of the 180–day extension period provided in the contracts did not automatically terminate the parties' contractual duties. Instead, it gave the buyers the right to elect to cancel. Some of them effectively did so. We need not decide if the buyers' 10–day notices of termination were actually time-of-the-essence notices. For these cases it does not matter. The March 31 closings scheduled by APS aborted because APS was not able to tender performance. Its failure to perform on the date it demanded a closing take place excused the buyers from any obligation to perform or to give APS further time to perform.

The arguments on this appeal include references to waiver of performance, parol evidence, and the statute of frauds. We have considered the arguments, and find them to be clearly without merit. *R.* 2:11–3(e)(1)(E).

Affirmed.