267 N.J. Super. 49 (1993)
630 A.2d 814
THE COASTAL GROUP, APPELLANT,
v.
PLANNED REAL ESTATE DEVELOPMENT SECTION, DEPARTMENT OF COMMUNITY AFFAIRS, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Submitted March 22, 1993.
Decided August 5, 1993.
*51 Before Judges PETRELLA, LONG and D'ANNUNZIO.
Carol J. Kronman, attorney for appellant.
Robert J. Del Tufo, Attorney General, attorney for respondent (Mary C. Jacobson, Senior Deputy Attorney General, of counsel; Eliaser Chaparro, Deputy Attorney General, on the brief).
The opinion of the court was delivered by LONG, J.A.D.
On this appeal, appellant, The Coastal Group, challenges, among other things, the authority of respondent, Planned Real Estate Development Section, Department of Community Affairs (DCA), to order rescission of contracts which violate The Planned Real Estate Development Full Disclosure Act, N.J.S.A. 45:22A-21 to -42, and the regulations promulgated thereunder. We hold that, pursuant to N.J.S.A. 45:22A-37, DCA has the power to order rescission.

I
This case centers around a condominium project known as Riva Pointe located along the waterfront in Weehawken, New Jersey. The project is being constructed in three phases. The Coastal Group is a partnership which applied for registration as the *52 developer of Phase 1. As part of its application for registration, Coastal submitted a proposed Public Offering Statement and form Purchase Agreement for DCA's approval. Because DCA was satisfied that the documents complied with the applicable regulations, they were approved for use effective April 12, 1989.
As approved, the Purchase Agreement provided the purchaser with an "estimated" date of closing and gave Coastal the option to give ten days written notice of a more exact date:
The Seller may notify the Purchaser in writing of the date of the closing. The Seller shall give the Purchaser at least ten (10) days written notice of the closing date and time. The estimated date of closing is ____ ("Closing Date"). Nothing contained herein shall prevent the Seller and the Purchaser from agreeing on a closing date without the necessity of written notice, provided that no default may be declared unless written notice is supplied as aforesaid.
While the Purchase Agreement refers to an estimated closing date, the Public Offering Statement makes clear that the date is, in fact, intended to be the controlling date for purposes of the purchaser's contractual obligation to close.
"Closing Date" means the date of closing pursuant to the Public Offering Statement unless another date is set forth in the Purchase Agreement covering a Unit.
In anticipation of any unforeseeable delays in the construction of the units, paragraph 9 of the Purchase Agreement afforded Coastal a "grace period" of 120 days after the estimated closing date to proceed with closing:
Seller shall not be liable for any loss or damage due to any delay in closing of title as a result of circumstances involving weather, war, strikes, lock-outs or other labor disputes involving the Seller or suppliers, delays in issuing of permits, or Certificates of Occupancy, inspections or any other similar reasons. If the closing of title is delayed for a period of 120 days or more following the estimated date of closing set forth in this Purchase Agreement, Purchaser may terminate the within Agreement without penalty and Seller shall refund all money paid on account by Purchaser without interest, in addition to a reimbursement of the reasonable costs of title search and surveys actually incurred by Purchaser, and both parties shall thereupon be discharged of all liability under this Purchase Agreement.
If the estimated closing date was not honored by Coastal and the purchaser had not elected to terminate the Agreement at the expiration of the grace period, paragraph 5 afforded Coastal the option to schedule a closing date after the estimated closing date *53 so long as it provided the purchaser with ten days written notice of a new "time of the essence" closing date:
If the date of the closing passes without title having been conveyed Seller may declare that "time is of the essence" by providing Purchaser with notice thereof and a closing date such date to be no earlier than ten (10) days from the date of the notice declaring time of essence. If the closing does not take place on the Closing Date as extended by said notice declaring time of the essence, to Purchaser and failure to close is not caused by any acts or omissions of Seller, then and in that event Purchaser shall be in default of this Agreement and Seller shall be entitled to its remedies as provided in this Agreement.
However, paragraph 5.7 of the Purchase Agreement made clear that the purchaser could not be required to close, nor could any notice of closing issue, until the unit was actually ready for occupancy:
The Purchaser understands that he will be under no obligation to close title unless the Seller provides a Temporary or Permanent Certificate of Occupancy for the Unit issued by the Township of Weehawken, at or before the time of closing, such Certificate of Occupancy being conclusive evidence that the Residential Unit is substantially complete according to the plans and specifications and is ready for the closing of Title.
Beginning in April, 1989, based upon the representations made by Coastal in the Purchase Agreement, the purchasers involved in this matter signed Purchase Agreements to buy units in Riva Pointe. Each purchaser gave a deposit of approximately 10% of the selling price. Coastal then set estimated closing dates that were generally one year later. Coastal was unable to complete the units in a timely fashion. After the expiration of the grace period, and no Certificates of Occupancy having been issued, the purchasers gave Coastal notice that they were terminating the Purchase Agreement and demanded the return of their deposits. Coastal refused to return the deposits, prompting the purchasers to file complaints with DCA.
After an investigation of three complaints (Parker, Rohl & Harth), DCA requested that Coastal explain why it failed to close as required by certain of the agreements. This action was taken by DCA pursuant to its statutory authorization to conduct "private investigations" in order to determine whether the Act has been violated or needs to be enforced. N.J.S.A. 45:22A-32a(6). Coastal *54 responded that, because the contractual closing date was only an "estimated" date, it could insist that the purchasers close at a much later date as each unit was completed.
DCA found that Coastal's failure to close violated its regulations and the Act as well as the terms of purchase agreements with the purchasers. In the interim, DCA had received similar complaints against Coastal from five additional purchasers. On November 13, 1990, DCA issued an order, encompassing the complaints of Parker, Harth, Sawyers, Klener, Rohl, Alpert, Schultz and Minerd, that recited findings and ordered Coastal to do the following:
1) return the deposits of all eight purchasers with interest by December 13, 1990;
2) pay a fine of $10,000 for each deposit that it failed to return by that date; and
3) cease and desist from closing on or contracting to sell any other unit, or taking a deposit on any other unit, if it has not returned the eight deposits with interest by December 13, 1990.
In addition, the order stated that DCA would revoke the project's registration if Coastal violated the cease and desist provision. Coastal was afforded the opportunity to request a hearing or other administrative relief within ten days of receipt of the order. Coastal moved before the Commissioner for an emergency stay of the order which was denied. Coastal then requested a hearing before the Office of Administrative Law (OAL). DCA did not enforce the order during the pendency of the hearing.
On April 17, 1991, DCA moved for leave to amend the order to include six additional purchasers (Park, Fraguela, Lazo-Munoz, Ellis, Stimmel and Gonzales-Sudell) who were also seeking returns of deposits for Coastal's failure to effect a timely closing. The administrative law judge (ALJ) granted the motion.
On April 23, 1991, the ALJ bifurcated the hearings so that DCA could make a final determination of certain common legal issues which did not require more evidence. The hearing covered six of eight purchasers in this case. In November, 1991, the ALJ issued an initial decision which rejected Coastal's interpretation of the purchase agreement relating to time of performance and concluded that Coastal's failure to close within the contractual extension period violated both the purchase agreements and the regulations. *55 He found that a penalty was appropriate but that DCA lacked the authority to order rescission or a return of the deposits. The ALJ rejected Coastal's claim that DCA denied it due process and found that Coastal's allegations of purchaser defaults could not constitute a legal defense. The ALJ utilized Coastal's misconduct to undergird the fine and the cease and desist order. However, the ALJ modified the cease and desist order so as to allow Coastal to close on already-contracted units, and to delay the prohibition on entering into new contracts and taking new deposits until "the issuance of a final agency determination in this matter."
On December 5, 1991, DCA filed exceptions to the initial decision and asked the Commissioner to find that it had the authority to order rescission. It requested that the Commissioner grant summary judgment for rescission on behalf of all fourteen purchasers. The Commissioner agreed with DCA and issued a final decision which granted summary judgment to DCA, including the rescission remedy.
Coastal moved for an emergency stay of the Commissioner's final decision which was denied. Coastal then filed a timely Notice of Appeal and moved before us for an emergency stay of the decision. We denied the stay, except for "that part of his decision which can be construed as a cease and desist order against contracting to sell additional units." Coastal then moved before the New Jersey Supreme Court for a stay which was also denied.
Coastal argues that the Commissioner's actions in rescinding the contracts were ultra vires; that even if empowered to rescind, rescission was an improper blanket remedy applied to the fourteen buyers without regard to the details of their cases; that the decision in Department of Community Affairs v. Atrium Palace, 247 N.J. Super. 511, 589 A.2d 1046 (App.Div.), certif. den. 126 N.J. 338, 598 A.2d 895 (1991) (Atrium Palace II) was wrongly applied to these facts; and that the Commissioner's refusal to hold a hearing denied Coastal due process. We disagree with each of these contentions and affirm.

*56 I
Although Coastal's argument as to DCA's lack of statutory authority to order rescission was improperly raised for the first time in a reply brief, Warren Tp. v. Suffness, 225 N.J. Super. 399, 412, 542 A.2d 931 (App.Div.), certif. den. 113 N.J. 640, 552 A.2d 166 (1988), we chose to address the issue because we consider it to be a matter of public importance.
The Planned Real Estate Development Full Disclosure Act, N.J.S.A. 45:22A-21 to -42, regulates developments in which unit owners share common elements or facilities. Included within its scope are developments of 100 units or more and all condominium or cooperative developments, regardless of the number of units up for sale. N.J.S.A. 45:22A-25a(7).
The Planned Real Estate Development Section is a part of the Division of Codes and Standards of DCA which is authorized to enforce the provisions of the Act. N.J.S.A. 45:22A-24. The Act specifically mandates that DCA promulgate regulations which, among other things, contain "provisions to insure that all contracts between developer and purchaser are fair and reasonable." N.J.S.A. 45:22A-35a. Consistent with that mandate, DCA has promulgated regulations implementing the provisions of the Act. N.J.A.C. 5:26-1.1 to -11.11. These regulations prohibit, as unfair and unreasonable, the following types of contract provisions:
A clause or provision requiring the purchaser to close prior to the issuance of a temporary certificate of occupancy on his unit;
* * * * * * * *
A clause or provision providing that a closing date may be delayed due to circumstances involving weather, strikes, lockouts or other labor disputes involving the developer or the suppliers, delays in the issuance of permits or inspections, or any other similar reasons unless there is a time limit placed on the permissible delay after which the Purchaser may terminate the contract without penalty. [N.J.A.C. 5:26-6.5(a)2, 9 (emphasis added)].
The Act requires a developer to file an application for registration. N.J.S.A. 45:22A-26a(1). One of the required application items is a copy of any Purchase Agreement that purchasers will be required to sign. N.J.S.A. 45:22A-27a(7). Another is the Public *57 Offering Statement which must be supplied to prospective purchasers and must describe the characteristics of the development, the nature of the interest being offered, as well as any relevant rights or restrictions applicable to purchasers. N.J.S.A. 45:22A-26d; N.J.S.A. 45:22A-28a; N.J.A.C. 5:26-4.1(a). The purpose of the Public Offering Statement is to allow a buyer to make an informed decision regarding the purchase of a unit.
DCA is required to review the purchase contract and Public Offering Statement to insure that they comply with the Act and its implementing regulations, as well as afford full and fair disclosure to prospective purchasers. N.J.S.A. 45:22A-29c. Only after specifically approving these documents may DCA enter an order registering the development. N.J.S.A. 45:22A-30b. Once the development is registered, the developer may sell units. N.J.S.A. 45:22A-26a(1). However, the developer remains obliged to comply with any of the representations made in any of the documents approved as part of the registration process. N.J.S.A. 45:22A-34a(4).
If the developer fails to live up to the obligations imposed by the statute and regulations, the Act authorizes DCA to devise appropriate remedies for violation.
a. If the agency determines after notice and hearing that a person has:
* * * * * * * *
(5) Violated any lawful order or rule of the agency; it may issue an order requiring the person to cease and desist from the unlawful practice or to take such other affirmative action as in the judgment of the agency will carry out the purposes of this act. [N.J.S.A. 45:22A-33a(5)].
Despite this broad grant of authority, Coastal argues that rescission is not an available arrow in DCA's quiver of remedies. More particularly, Coastal contends that the Legislature's elimination of rescission as a specific remedy under N.J.S.A. 45:22A-37 prevents DCA from ordering it. What this argument refers to is the section of the Act which deals with a purchaser's private remedy against a developer.
*58 As originally written, the Act provided that an offending developer would be liable to the purchaser for "actual damages suffered" plus court costs and attorney's fees. It also provided that the purchaser
under the preceding subsection, may recover the consideration paid for the lot, parcel, unit, or interest in the development together with interest at the rate of 6% per year from the date of payment, property taxes paid, costs, and reasonable attorneys fees less the amount of any income received from such lands upon tender of appropriate instruments of reconveyance. If the purchaser no longer owns the lot, parcel, unit or interest in the development, he may recover the amount that would be recoverable upon a tender of a reconveyance less the market value of the land or property when disposed of and less interest at the rate of 6% per year on that amount from the date of disposition. [L. 1977, c. 419, § 17b].
The Act was amended to provide that, in place of actual damages, a purchaser could recover "double" damages, N.J.S.A. 45:22A-37a, and to eliminate the cumbersome rescission formula in the earlier version. The Senate explained this amendment in the statement of the Senate State Government, Federal and Interstate Relations and Veterans Affairs Committee dated March 22, 1976.
The bill provides for recovery of damages and penalties. The recovery of damages section was amended so that rather than a detailed rescission formula as specified in the original language, a purchaser who brings a successful action would be awarded double damages.
Simultaneous with the amendment of the purchaser-remedy portion of the statute, the Legislature added the following language:
The court may, in addition to remedies provided herein, frame such other relief as may be appropriate under the circumstances. If the purchaser shall fail in establishing a cause of action, and the court further determines that the action was wholly without merit, the court may award attorney's fees to the developer. [N.J.S.A. 45:22A-37b.]
In light of this expansive language, Coastal's suggestion that the amendment of the purchaser's remedy section of the Act evidenced an intention by the Legislature to eliminate rescission altogether as a purchaser's remedy is plainly wrong. As the Senate Committee Statement indicated, it was only the rescission "formula" which was removed from the Act, not the remedy itself. The Court's power to "frame such other relief as may be appropriate under the circumstances" thus clearly includes rescission.
*59 It follows that nothing in the Act can be read as an indication that the Legislature intended to narrow the power granted to DCA in N.J.S.A. 45:22A-33a(5) "to take such other affirmative action as in the judgment of the agency will carry out the purposes of this act." Coastal's contention that the Legislature's failure to spell out rescission evidences the intent to exclude this remedy offends the broad language used in N.J.S.A. 45:22A-33a(5). In our view, rescission is clearly encompassed within the comprehensive powers accorded DCA by the Act which contains no language which would support a narrower construction. In authorizing the regulation of planned real estate developments, DCA is not limited in the way it chooses to carry out its statutory mandate.
Moreover, even if the statutory grant of authority was ambiguous (which we think is not the case), DCA, like all administrative agencies, is invested with those incidental powers which are reasonably necessary to effectuate its statutory mandate. New Jersey Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 562, 384 A.2d 795 (1978); In re Adoption of N.J.A.C. 7:26B, 250 N.J. Super. 189, 205, 593 A.2d 1193 (App.Div. 1991), aff'd in part, rev'd in part, 128 N.J. 442, 608 A.2d 288 (1992). Our courts liberally construe statutes so that regulatory agencies are given such implied powers as may be required to fulfill the statutory objectives. State Farm Auto. Ins. Co. v. New Jersey, 124 N.J. 32, 54, 590 A.2d 191 (1991); New Jersey Guild, supra, 75 N.J. at 562, 384 A.2d 795. A determination by the agency that a fine or a cease and desist order would be inadequate to deter future violations, or that requiring each individual consumer to institute a litigation would be too burdensome undergirds the need for the alternative remedy of rescission to fulfill DCA's statutory objectives. In sum, the rescission remedy is both explicitly and implicitly within the statutory powers of DCA.

II
With respect to the remaining issues, we are satisfied that the contract documents, the Public Offering Statement and the *60 DCA regulations entitled the purchasers to terminate the contracts. The purchase agreement recited a time limit of 120 days. At the expiration of that period, the seller was not ready to close and no certificates of occupancy had issued. Under the contract, the buyers could not be compelled to close in the absence of a certificate of occupancy, nor could Coastal schedule a closing date after the expiration of the grace period once the buyers elected to terminate. If the buyers did not have the right to rescind under those circumstances, the time limit on delay in closing in the contract was meaningless and the regulation requiring such a time limit a sham. We thus affirm the buyers' right to terminate their purchase agreements after the end of the extension periods and hold that no term of the special risks section of the offering statement impaired that right. Atrium Palace II, supra, 247 N.J. Super. 511, 589 A.2d 1046.
Coastal argues that the Atrium Palace cases are inapplicable here because they involved time-of-the-essence notices. To be sure, such notices were present in those cases. However, we do not view them as limited to such situations but as addressing a reasonable time to cure. They hold that where, as here, the parties have agreed on a fixed extension period, that period is the limit on the time which may be claimed as reasonable to perform. Paradiso v. Mazejy, 3 N.J. 110, 116, 69 A.2d 15 (1949); Larkin v. Koether, 101 N.J. Eq. 176, 178, 137 A. 849 (Ch. 1927), aff'd, 102 N.J. Eq. 329, 140 A. 920 (E. & A. 1928). Pursuant to the Atrium Palace cases, the parties can decide for themselves exactly how much time is reasonable to allow. Such a reading of the Atrium Palace cases is congruent with the DCA regulation that prevents a buyer and a seller from providing for a delay of a closing date unless they specify a limit for it. N.J.A.C. 5:26-6.5(a)9.
As to Coastal's claim that it was entitled to prove that some of the buyers were not ready, willing and able to perform under the contract, we held in Department of Community Affairs v. Atrium Palace, 244 N.J. Super. 329, 582 A.2d 821 (App.Div. 1990), certif. den. 126 N.J. 317, 598 A.2d 878 (1991) (Atrium Palace I), that *61 when a developer is unable to perform by the end of the grace period, the purchasers are entitled to terminate their agreements and demand the return of their deposits without inquiry into their readiness to perform.
APS next argues that it was deprived of the opportunity to explore the material factual issue whether the buyers were ready, willing and able to perform on the scheduled closing date. We agree with the DCA that the issue is not material. APS promised completion and closing in October 1988. It was not yet able to perform when the deadline of March 30, 1989 arrived. The remedy sought by the buyers and granted by DCA was not breach-of-contract damages but rather rescission and a return of their deposits. If damages were sought, the question whether the buyers were ready or able to perform might be material. But here there is no question but APS's deadline for performance was March 30, it was not ready to perform, and the DCA order gives buyers only their money back. In these circumstances, the buyers' readiness or ability to perform on March 30 is not material. [Atrium Palace I, supra, 244 N.J. Super. at 333, 582 A.2d 821 (citations omitted)].
All that Atrium Palace II clarified was that termination at the end of the grace period was not automatic but had to be "elected." Atrium Palace II, supra, 247 N.J. Super. 511, 589 A.2d 1046. That is exactly what occurred here.
Finally, we are satisfied that no due process rights of Coastal were infringed by these proceedings. N.J.S.A. 45:22A-33b merely requires adequate factfinding by the agency prior to the issuance of a temporary cease and desist order and N.J.S.A. 45:22A-32a(6) authorizes private investigations in aid of the enforcement of the Act. So long as a full blown hearing takes place prior to final agency action, which is what occurred here,[1] no due process issues are implicated. Further, we are satisfied that the record before the Commissioner amply undergirded his conclusions.
Affirmed.
NOTES
[1] As discussed supra, DCA did not enforce its order during the pendency of the OAL hearing.